A. I. STONE, as Administrator of the Estate of BENJAMIN F. ECKLES, Deceased, Respondent, v. UNION PACIFIC RAILROAD COMPANY, a Corporation, Appellant.

No. 1906. Decided February 9, 1909 (100 Pac. 362).

1. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES—NEGLIGENCE. On the issues whether the conduct of a business required the promulgation and enforcement of rules for the protection of employees, and whether the employer negligently failed to promulgate any rules or promulgated insufficient rules, it is proper to show that others engaged in the same business adopted and enforced rules, and to show what such rules are. (Page 321.)

35 Utah—20

2. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. That a rule promulgated and enforced by an employer for the protection of his employees is insufficient because it fails to prescribe a reasonably safe method of doing a particular work, may not always be shown by simply proving that others engaged in a similar business adopted different rules on the same subject. (Page 321.)

3. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. A master engaged in a dangerous business must promulgate such rules for the conduct of the business as will afford reasonable protection to his servants; but he need not adopt any particular rule, and when the rule adopted, enforced and followed is sufficient to protect the servants the rule is sufficient. (Page 321.)

4. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. A master must use reasonable care to inform his servants of the rules promulgated for their protection, and to see that the rules are complied with. (Page 321.)

5. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. The test of the sufficiency of rules promulgated by a master for the safety of his servants is, whether the rules prescribing the method of work, if obeyed, afford reasonable protection to the servants, and hence the sufficiency of a particular rule cannot in most cases be determined by a simple comparison of one rule with that of another adopted on the same subject. (Page 322.)

6. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. A master's negligence in failing to promulgate and enforce any rules for the conduct of the business may in some cases be established by evidence that the business is commonly regulated, together with the manner of such regulation. (Page 322.)

7. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. A servant complaining of the failure of the master to adopt any rules for the conduct of the business or to adopt sufficient rules has the burden of establishing that a rule is necessary, and when a rule has been adopted he must show wherein it is insufficient. (Page 322.)

8. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. The jury must determine the sufficiency or insufficiency of a master's rule prescribing a method of doing the work from the evidence in which the character of the work is shown, and in what way the rule should regulate the work

so as to make it reasonably safe, and why the rule in question, if followed, does not accomplish such result. (Page 324.)

9. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. A rule promulgated by a railway company for the running of trains over a single track in opposite directions cannot be condemned from a mere inspection of the rule or by comparing it with the rules of another company on the same subject, but the evidence must make clear the requirements of the business and how and why regulation is required, and the facts from which the deduction may be made why one method is better than another. (Page 325.)

10. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. Where, on the issue of the sufficiency of the rules of a railway company providing that numbers in train orders would be stated in figures only, and that each order given by the train dispatcher to the operator would be repeated and O. K.'d by the dispatcher, there was nothing to show that the rules which had been in force about two and one-half years failed, when followed, to afford reasonable protection to the employees, and the evidence showed that rules of other companies required that numbers in train orders should be stated in figures and words, but there was nothing to show that by following such rules mistakes would be avoided, the jury could not condemn the rules as insufficient. (Page 327.)

11. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. On the issue of the sufficiency of a rule of a railway company providing that numbers in train orders would be stated in figures only, an instruction that, if the jury found that ordinary care required the adoption of a rule that the numbers should be expressed both in words and figures, the failure of the company to exercise such ordinary care was negligence, was erroneous, as declaring the company negligent unless it adopted a particular rule. (Page 327.)

12. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. An employer is not required to adopt one method rather than another in conducting his business, and courts and juries cannot dictate a choice between methods, all of which are reasonably adequate. (Page 328.)

13. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. Whether a railway company was negligent in the conduct of its business as to the running of trains over the same track in opposite directions cannot be determined by mere comparison of its method with that employed by others, though it be conceded that the method used by others was

reasonably safe, for it does not follow that because one method is safe a different one is not. (Page 329.)

14. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. Rules deliberately promulgated by a master for the government of a dangerous business are presumptively reasonable and sufficient, and should be condemned only when it is clearly shown that they are in fact insufficient. (Page 331.)

15. MASTER AND SERVANT—RULES FOR THE PROTECTION OF EMPLOYEES —NEGLIGENCE. The question of the sufficiency of a rule promulgated by a master for the conduct of his business is for the jury.[1] (Page 331.)

16. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY. The question of the contributory negligence of an employee is ordinarily one of fact, and cannot be determined as a question of law unless all reasonable minds will arrive at the same conclusion. (Page 334.)

17. MASTER AND SERVANT—ASSUMPTION OF RISK—QUESTION FOR JURY. The question of an employee's assumption of risk is ordinarily one of fact, and cannot be determined as a question of law unless all reasonable minds will arrive at the same conclusion. (Page 335.)

18. MASTER AND SERVANT—ASSUMPTION OF RISK. A locomotive engineer must be held to know and appreciate the ordinary dangers incident to the movement of trains under the rules and methods adopted by his company, in so far, at least, as those rules and methods are reasonably sufficient to protect him against unnecessary and avoidable dangers, and to this extent the rules and methods of the company which are, or by the exercise of ordinary care may be, known, become a part of his contract of employment. (Page 335.)

19. MASTER AND SERVANT—ASSUMPTION OF RISK. A locomotive engineer is chargeable with that knowledge which an ordinary man possessing the skill and experience he possesses will know, or by the exercise of ordinary care ought to know, under the circumstances. (Page 336.)

20. MASTER AND SERVANT. A locomotive engineer must follow the rules adopted by the company governing the actions of employees to insure reasonable safety in the movement of trains, in so far as he knows the rules or by the exercise of ordinary care may know them. (Page 336.)

---

[1] Johnson v. U. P. Coal Co., 28 Utah 46, 76 Pac. 1089, 67 L. R. A. 506.

21. MASTER AND SERVANT—INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE. The rules of a railway company required engineers in charge of inferior trains to refuse to start from a station unless they could reach the next station in time to properly clear superior trains, and provided that at meeting points the inferior train must take the siding at least ten minutes before the time of the superior train. A superior passenger train was scheduled, according to train orders, to pass a station at 12:02 a. m. The engineer of an inferior train running in the opposite direction left a point six miles away for such station at 11:41 p. m. The engine of the inferior train was defective, and the engineer knew it. A collision between the trains occurred at about 12 o'clock, before the freight train reached such station. *Held*, that the engineer was guilty of contributory negligence, as a matter of law, in attempting to reach such station ahead of the passenger train. (Page 338.)

22. MASTER AND SERVANT—RULES—OBEDIENCE OF RULES. A rule of a railway company which provides that at meeting points between trains of different classes the inferior train must take the siding and clear the superior train at least ten minutes before the schedule time of the superior train must be implicitly followed by the employees. (Page 338.)

23. NEGLIGENCE—TEST OF "NEGLIGENCE." While the ordinary test of negligence is whether a man of ordinary intelligence and prudence would have done or omitted the act in question under the particular circumstances, yet there are circumstances under which the law does not permit an act or its omission to be excused merely because some persons would have been willing to undertake it, for the hazard may be apparent and serious. (Page 339.)

24. MASTER AND SERVANT—OBLIGATION OF EMPLOYEES—PREVENTION OF INJURY. The duty of an employee to use ordinary care to prevent injury to himself and others is continuous, and is not suspended simply because the employee may have been exposed to danger through the negligence of the master, and, however gross the negligence of the master, the servant discovering the danger must use ordinary care to avoid consequent injury. (Page 343.)

25. MASTER AND SERVANT—INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE. The rules of a railway company prescribed that at meeting points between trains of different classes the inferior train must take the siding and clear the superior train at least ten minutes before the scheduled time of the superior train. A superior passenger train was scheduled according to train orders to pass a station at 12:02 a. m. The engineer of an in-

ferior train running in the opposite direction left a point six miles away for such station at 11:41 p. m. The engine of the inferior train was defective, delaying the train, and a collision occurred between the trains at about 12 o'clock, before the freight train reached such station. The engineer of the freight train and the other trainmen failed to take any steps to guard the train, though it failed to reach such station and take the siding within the time fixed by the rules of the company. *Held*, that the engineer and other trainmen were, as a matter of law, guilty of contributory negligence in failing to take precautions to protect the train, defeating a recovery. (Page 347.)

26. Master and Servant—Injury to Servant—Negligence of Master Concurring with Negligence of Fellow Servant—Effect. Where the negligence of a master concurs with the negligence of a fellow servant, the master is liable to the injured servant.[2] (Page 347.)

27. Master and Servant—Obligation to Furnish Safe Appliances. A master must exercise reasonable care to provide his servants with reasonably safe machinery, and to exercise such care to maintain the same in repair. (Page 349.)

28. Master and Servant—Defective Appliances—Assumption of Risk. While a servant may assume that machinery is safe until he knows the contrary, yet when he knows of the unsafe condition and appreciates the danger, or it is so obvious that by mere casual inspection he can see it, he assumes the danger, in the absence of any special circumstances or emergency, especially where he is an expert in the position and as such is operating the machinery. (Page 349.)

29. Master and Servant—Injury to Servant—Assumption of Risk. Where an experienced locomotive engineer in control of his train, with respect to the time of starting it from a given station, with a view of meeting a train at another station running in the opposite direction, knew of the defective condition of the engine and what effect such defect might have, he assumed all the ordinary risks incident to the operation of the train, including the fact that the condition of the engine might retard the speed of the train so as to prevent his reaching the station in the time fixed by the rules to meet the other train, precluding a recovery for injury in a collision between the trains. (Page 350.)

30. Master and Servant—Injury to Servant—Assumption of Risk. Where there is a positive rule of safety which a servant must obey, and the evidence without conflict shows that the rule was

---

[2] Stone v. U. P. Ry. Co., 32 Utah 185, 89 Pac. 715.

not obeyed, and that if it had been obeyed an accident result-
ing in injury would not have occurred, the servant cannot re-
cover, as a matter of law.   (Page 352.)

STRAUP, C. J., dissenting.

APPEAL from the Second District Court Weber County.—
*Hon. J. A. Howell,* Judge.

Action to recover damages for the death of plaintiff's in-
testate, alleged to have been caused by the negligence of the
defendant.   From a judgment for plaintiff, the defendant
appealed.

REVERSED.

*P. L. Williams, Geo. H. Smith* and *John G. Willis* for
appellant.

*W. L. Maginnis* and *James H. DeVine* for respondent.

FRICK, J.

This is an appeal from a judgment in favor of respondent
entered in an action brought by him to recover damages for
the death of his intestate, alleged to have been caused by the
negligence of the appellant.   The death resulted from a col-
lision of a passenger train and a freight train run in opposite
directions over the defendant's line of railroad near Azusa
in the state of Wyoming.   Deceased was in defendant's em-
ploy, and was the engineer of the freight train, designated
"Extra 1,661," the number of the engine drawing the train.
The train consisted of thirty-one loaded freight cars carry-
ing about 1,027 tons.   It was started eastward over defend-
ant's line from Evanston at 5:20 p. m. on November 11th,
1904.   It was an ordinary fast freight, carrying miscel-
laneous through merchandise.   It had no regular time, and
was not shown on the regular schedule of trains, but traveled
entirely on telegraphic orders.   Its movements over the road
were controlled by telegraphic orders issued by the train dis-

patcher at Evanston, which orders were transmitted by him by means of the telegraphic code to operators at various stations along the line, and which were by them repeated, transcribed, and delivered to the train operatives. The movements of all trains were kept by the train dispatcher from information furnished him by the operators at all stations where there was telegraphic communication. These operators reported to the dispatcher, among other things the arrival, departure, and passage of all trains.

The first division over which extra 1,661 traveled was from Evanston to Granger, a distance of about seventy miles. Between Evanston and Granger were about fourteen stations, from four to seven miles apart. When the train left Evanston, it had running orders to run to Granger. When it reached Granger all orders theretofore delivered to the train crew of No. 1661 concerning the movements of the train ended and became ineffectual. From Granger east the train was in effect a new train. The crew was not authorized to proceed east of Granger without first having received new telegraphic orders from the train dispatcher at Evanston. The passenger train designated No. 3 was running west. At Altamont, which is about twelve or thirteen miles east of Evanston, the crew of No. 1661, at 8:05 p. m., received train order No. 59, which read as follows:

"No. 3 will run one hour, thirty minutes late Green River to Evanston. No. 5 will run fifty minutes late Green River to Granger. H. V. P. (Initials of Superintendent.) Conductor and engineman must each have a copy of this order. Repeated at 7:39 p. m. Conductor Lowham. (Conductor of No. 1661.) Made complete at 8:05. Received by E. Gordon. (Operator at Altamont.)"

Green River is about thirty miles east of Granger, or one hundred miles east of Evanston. Train 1661 arrived at Granger at 11:25 p. m. Its train crew at that place received, at 11:35, train order No. 66:

"Engine 1661 will run extra Granger to Green River ahead of Nos. 19 and 25 Granger to Peru. H. V. P. Con-

ductor and engineman must each have a copy of this order. Repeated at ——— m. Conductor Lowham. Train 1661. Made comp. at 11:35. Received by Miller."

At the same time and place they also received a train order from Miller, which was also numbered 59, and read as follows:

"No. 3 will run one hour and fifty minutes late Green River to Granger. H. V. P. Conductor and engineman must have a copy of this order. Repeated 7 p. m. Conductor Lowham. Train 1661. Made comp. at 11:35 p. m. Received by North."

The method of issuing train orders by the train dispatcher at Evanston was as follows: He would issue the order and cause it to be transmitted by wire to the station operator first in order and this operator would then repeat it back to the dispatcher. In that way the dispatcher would be informed whether the order was correctly received and understood by the operator. If the order was repeated back correctly, the dispatcher would "O. K." it and so inform the operator, and then make a record of it in a book kept for that purpose in the dispatcher's office. All orders were numbered consecutively, commencing at midnight of one day and ending at midnight of the next. If it was desired to transmit an order to more than one operator, it would be transmitted to as many operators along the line as would be required to report the same to the train crews which were affected by the order, and the order would be repeated back to the train dispatcher by each operator in the same manner as was done by the first who received it. The repetitions of the order would be indicated by the train dispatcher by writing in the record referred to the name of the station or operator opposite to the order as recorded in the book, and by drawing a line or underscoring the name of each operator receiving it. In this way the record would show to whom the order had been sent, and how often it had been repeated back as correct. Train order No. 59, in which No. 3 was reported to run one hour and thirty minutes late, had been repeated back in that form to the dis-

patcher six times by different operators along the line during the evening and night of the accident. Each operator was required to transcribe train orders in accordance with the rule in force on appellant's system, which provided:

"Operators receiving train orders must write them in manifold during transmission, and if they cannot at one writing make the requisite number of copies, must trace others from one of the copies first made, repeating the same to dispatcher and receiving his 'O. K.'"

The usual number of orders required for each train was three, one for the conductor, one for the engineer, and one for the operator, from which, if more were needed, others were to be traced as stated in the rule.

The record kept by the train dispatcher at Evanston contained the record of train order No. 59, in which No. 3 was shown to run one hour and thirty minutes late, but did not disclose any order that No. 3 would run one hour and fifty minutes late. How the second No. 59 order was changed from one hour and thirty minutes to one hour and fifty minutes is not made to appear, except by inference. It does appear, however, that both train orders, No. 59 and No. 66, were received by Miller, the telegraph operator at Granger, and were transcribed by him and delivered to the train crew of No. 1661. Both were in his handwriting. Prior to November 9th, Miller had been the regular night operator at Granger. He resigned on the 9th day of November. An operator by the name of Northington was sent to take his place. Northington was not on duty the night of the 11th. Miller was the operator in charge and received, transcribed, and delivered the last two train orders referred to. He signed his own name to one of them; to the other the name of "North"—for Northington.

In addition to the foregoing, there are other material facts, but, in order to avoid unnecessary repetition, it is deemed best to state them in connection with the particular question discussed.

In the complaint, the acts and omissions constituting ap-

pellant's alleged negligence, so far as material here, are, substantially, stated to be as follows: That said appellant was "negligent and careless in this, to-wit, that whenever in a train order it was necessary to use figures, that the same should be transmitted by its train dispatcher to the operators at the various stations concerning the movements of trains on its road, ordinary care and prudence require that such figures should be expressed in the telegraphic code over the telegraph wires in both words and numerals, and plaintiff says that ordinary care and prudence required of the said defendant company that it should make and promulgate a rule to its various train dispatchers, operators, and other employes requiring them in transmitting their orders from the telegraph wires to express figures used therein in both words and numerals, so as to prevent possibility or probability of such message being wrongly transcribed"; that the appellant negligently failed to promulgate such a rule, "but allowed and permitted its train dispatcher to issue, the order heretofore referred to in figures only"; that the defendant well knew "that such a rule was required to prevent mistakes, and said train dispatcher, being permitted to do so by said defendant, failed to send said train order in words and figures but sent the same . . . by the use of numerals only, thereby causing said train order to be transcribed so as to read that No. 3 would run one hour and fifty minutes late, whereas said No. 3 was not one hour and fifty minutes late; that said train order as transcribed was delivered to the employees of said freight train, which caused them to believe they had sufficient time to run to Azusa and go upon the side track before No. 3 reached them, . . . and thereby the said failure of the said company to make and promulgate such rule caused the said two trains to collide together, and caused the death of plaintiff's intestate."

There are further allegations of negligence, but they relate to the defective condition of the freight engine operated by

the deceased, and have no bearing upon the questions now to be considered.

The appellant denied all acts of negligence, set forth the rules of the company, and averred that the deceased had disregarded them, and pleaded contributory negligence and assumption of risk.

From the allegations in the complaint it is reasonably clear that there is no charge that the train dispatcher issued and transmitted a false train order, or caused such a one to be delivered; but the charge is that the train order was incorrectly written or transcribed and delivered by the operator, and that the appellant was negligent in not promulgating a rule that train orders should be issued and transmitted in both words and figures. That is, where a certain number was given, it should, for example, be written thus: "(20) twenty." Upon the trial, to establish the negligence alleged as stated above, the respondent was permitted to prove, over appellant's objections and exceptions, that prior to 1902, and up to the spring of that year, the appellant had a rule in force which required that in train orders where numbers were given they should be stated in both figures and words, as indicated in the foregoing example; that in the spring of that year the rule was changed so as to require numbers to be stated in figures only; that other railroads either had a rule in force which required numbers to be stated in both figures and words, or, that, in issuing train orders, they used the method of repeating numbers in both words and figures.

The rule, a copy of which was introduced in evidence, which was in force on appellant's system up to the spring of 1902, is as follows: "Rule 526. Designation of trains. Regular trains will be designated in orders by their schedule numbers, as 'No. 10 (ten)' or 'Second No. 10 (ten)'; extra trains by engine number, as 'extra 798 (seven, nine, eight).' All numbers in body of orders to be written in figures and words. The direction of the movement of extras will be added when necessary, as 'east' or 'west.' "

The rule as changed and in force during and after the year 1902, is as follows: "Rule 206. Regular trains will be designated in train orders by their number, as 'No. 10,' or '2d No. 10,' adding engine numberes when necessary to further identify train; extra trains by engine numbers, as 'extra 798,' with the direction when necessary, as 'east' or 'west.' Other numbers and time will be stated in figures only."

The rule which was testified to be in force on a large number of other railroad systems both East and West, and which was shown to be among the rules in force on the Denver & Rio Grande Railroad, is as follows: "526. Regular trains will be designated in orders by their schedule numbers, as 'No. ten (10),' or '2nd No. ten (10),' '1st No. one (1st 1),' and the direction of the movement of irregular trains shall be added, as 'east,' or 'west,' also adding engine number in figures. Time and number of trains will be stated in words duplicated in figures. Abbreviations, except such as are specified in rule 527, will not be used."

In addition to the foregoing rules, a copy of a train order issued by the Atchison, Topeka & Santa Fe Railroad in February, 1898, wherein numbers were given in words and repeated in figures, was also introduced in evidence. The evidence also tended to show that the deceased was provided with a copy of appellant's rules after the change was made as aforesaid, to-wit, on February 24th, 1902, and at which time he passed an examination with regard to his knowledge of appellant's rules. The testimony of experts in the railroad business also tended to show the difference in the method of issuing train orders by the appellant and a large number of other roads. This testimony, as well as the rules and train orders of other railroads, was all admitted over appellant's objections and exceptions. The testimony was, however, limited to a particular fact, as the questions and answers clearly show. It is not practical to set forth all the testimony upon this point, nor is it necessary to do this, since the questions propounded to all of these experts and the

answers thereto are, in effect, the same. We will therefore give only the questions asked and answers given thereto by Mr. George B. Winters and Mr. F. E. Ripley, both of whom seem well qualified from experience to testify upon the point in question. Counsel for respondent propounded the following question to Mr. Winters, namely: "Did you become familiar with the method employed on the Santa Fe in train orders used on that road in the particular asked about? What was the method employed by them?" Mr. Winters answered: "The method was to write the figures out in words and figures in the body of the train orders." The same question was asked him with regard to the Chicago & Northwestern Railway, and the answer was: "That the figures were written out in words; also figures were used in orders." Mr. F. E. Ripley, in answer to the same question, said: "The time in the body of train orders was given in figures as well as written in words." The only practical difference between the several witnesses who testified upon this point was that of limiting the testimony of each witness to the railroad or railroads with whose method the witness was familiar. The assistant superintendent of appellant also testified that rule 206, as herein set forth, was a standard rule, and "is made up by the principal railway officials, such as general managers, of the United States, and is generally used on the most important railways in the United States." The evidence, therefore, with regard to the promulgation and enforcement of rules governing the issuance and transmission of train orders which are claimed to have been insufficient, in substance amounts to this:

That a large number of railroads, including the appellant, prior to 1902, had a rule in force requiring train orders to the train crews to be issued by giving numbers in both words and figures; that in the year 1902 appellant changed the rule and method upon its railroad system, and thereafter required that numbers be given in figures only, and that operators were required to transcribe orders in manifold, and, if additional copies of any order were required, to trace them

from an original; that at least a few of the larger railroads were shown by direct evidence to have continued the method of giving numbers in both words and figures after 1902 and up to the time of the accident, while nothing is shown with regard to the majority of the other railroads after 1902 in this regard except by the inference that those roads may have continued the old method in force from the fact that it was in force prior to that time; that two No. 59 orders were delivered to the train crew on train 1661, one of which read that No. 3 would run one hour and thirty minutes late, the other that it would run one hour and fifty minutes late; that the first order was recorded in the record book of the train dispatcher, but no record appeared of the latter; that the first was correctly repeated back six times, while there was no record that the latter had been sent out or repeated back.

Upon this evidence the court submitted the question of appellant's negligence with regard to its duty in the promulgation and enforcement of rules in the following instruction: "The court charges you that it was the duty of the defendant company to use ordinary care to make and publish to its employees engaged in controlling the operation of its trains such reasonable and necessary rules for the safe promulgation, transmission, and delivery of its train orders as would afford reasonable protection to its employees engaged upon such trains, and such as would reasonably provide against the probability of mistakes being made in the transcribing of such orders. *Therefore the court charges you that if you find by a preponderance of the evidence in this case that ordinary care required that the defendant company at the time of the accident here in question should have adopted a rule providing that when time is stated in the body of a train order it should be expressed both in words and figures, and not simply in figures, then the court charges you that the failure of the defendant company to exercise such ordinary care would constitute negligence; and if you find by a preponderance of the evidence that such failure to exercise ordinary care in that respect was a proximate cause*

*of the injury and death of plaintiff's intestate—that is, that
had it not been for the failure to adopt such a rule the plain-
tiff's intestate would not have been injured and killed—then
the plaintiff would be entitled to recover in this action,* un-
less you find that plaintiff's intestate was guilty of contrib-
utory negligence, or assumed the risk, as will be hereinafter
explained to you; but if you find from the evidence either
that the ordinary care did not require the adoption of such
a rule, or that the failure to adopt such a rule was not the
proximate cause of the injury and death of plaintiff's intes-
tate—that is, that even if such a rule had been adopted the
accident could still have happened—then the court charges
you that the plaintiff is not entitled to recover in this
action."

The same rule was laid down in another instruction in
practically the same phraseology. Appellant excepted to that
portion of the instruction which we have italicized, and also
excepted to the same phraseology in the other instructions,
and has assigned the giving of these portions as constituting
prejudicial error. The admission of the evidence with regard
to the rules and methods in force on other railroads is like-
wise assigned as error. At the close of the evidence the ap-
pellant requested the court to direct the jury to return a
verdict in its favor upon the ground that respondent was
precluded from recovering as a matter of law. The court
refused to so direct the jury. The appellant excepted, and
now urges such refusal as error. These assignments, for
obvious reasons, may be considered together.

The assignment that the court erred in admitting in evi-
dence the rules and methods adopted by other railroads with
respect to issuing train orders: We are of the opinion that
in the mere admission of this evidence the court committed
no prejudicial error. Where the claim is made that the con-
duct of a particular business requires the promulgation and
enforcement of certain rules and regulations for the protec-
tion of the employees, and the assertion is made that

the employer was negligent in not promulgating any, or in promulgating insufficient, rules, it is always proper to show that others who are engaged in the same line of business have methodized the business by the promulgation and enforcement of rules and regulations. From this it must necessarily follow that it may likewise be shown what the rules and regulations are that have been adopted and enforced by others, at least as a foundation for other evidence and in connection therewith. This matter is discussed in 1 Labatt, Mast. & Serv., in sections 211 to 217, where the authorities are cited which support the doctrine as above stated. Where, however, the question is narrowed, as in this case, to the one proposition, that the rule promulgated and enforced by the party complained against is insufficient because it prescribes a method of doing particular work, which method is not reasonably safe, and, therefore, the master was negligent in not promulgating a different rule and safer method, then the rule asserted to be insufficient may not always be shown to be so by simply showing that others who are conducting a similar business have adopted different rules upon the same subject. "Where a master is engaged in a complex or dangerous business, he must adopt and promulgate such rules and regulations for the conduct of his business and the government of his servants in the discharge of their duties as will afford reasonable protection to them." Further than this: "It is the duty of the master to use reasonable care to see that the rules adopted by him for the safety of his servants are complied with." 26 Cyc. 1157-1159. The master must likewise use all reasonable care to inform the servants of the rules adopted by him. But it is not the duty of the master to adopt or enforce any particular rule or method in conducting his business. If the rule or method adopted and enforced by him, when followed, is sufficient to protect the servant and to secure his safety so far as this may be done by the exercise of ordinary care of the master in the supervision of his business and servants, then the rule

35 Utah—21

adopted by him may not be condemned upon the sole ground that others who are conducting the same kind of a business have adopted and are enforcing a different rule or method. As between master and servant, the master is not negligent simply because he has not adopted what others may deem a better method, provided the one he has adopted is sufficient to adequately protect the servant and to secure his safety as above stated. The test, therefore, with respect to the sufficiency of any rule which prescribes the method of doing the work must always be whether or not the rule, if obeyed, fulfills the measure or standard of protection and safety required by law. The sufficiency or insufficiency of a particular rule can therefore, in most cases, not be determined by a simple comparison of one rule with that of another adopted upon the same subject. Where the complaint is made that the master was negligent because he failed to promulgate and enforce any rule with regard to the conduct of his business, then the fact that the conduct of the business is commonly regulated, and the manner of such regulation, when shown, may be evidence of negligence, and may, under certain circumstances, alone be sufficient to establish negligence in failing to promulgate a rule. But in any event, if the servant complains that no rules have been adopted, or of insufficient rules and defective methods, the burden is cast upon him to establish that a rule was necessary, and, in case one has been adopted, he must show wherein it is insufficient.

In 1 Labatt on Master & Servant, sec. 211, in speaking to this point, the author says:

"If the plaintiff relies upon the theory that some specific rule should have been promulgated under the circumstances, he must show not only that the rule suggested was necessary, but that it was reasonable and proper, and, if observed, would have adequately protected the employees. . . . The principle that a master is not bound to adopt any particular methods of work involves, in the present connection, the corollary that, where the rules promulgated by an employer afford ample protection if they are duly observed,

the fact that different rules for the same emergency have been adopted by other employers is not sufficient to show that he is negligent."

In *Smith v. N. Y. C. & H. R. Ry. Co.,* 88 Hun, 468, 34 N. Y. Supp. 881, Mr. Justice Mayham, at page 882 of 34 N. Y. Supp., at page 470 of 88 Hun, says:

"It is urged by the appellant that the proof shows that other railroads have different rules from those adopted by the defendant, and that from that proof the jury might have found that the rules of the defendant were defective to such an extent that the jury might have found it guilty of negligence; but we find no proof that the rules of the defendant were so defective that, if strictly followed by the employees, they would not have afforded adequate protection to all employees acting under them."

The trial court in that case held that the jury were not authorized to find that the defendant was negligent in adopting a rule upon the sole ground that other railroads had adopted a different one upon the same subject by simply comparing the defendant's rule with such other rules, and the Supreme Court of New York sustained the ruling of the trial court, as appears from the foregoing quotation.

In *Hannibal & St. Joe Ry. Co. v. Kanaley,* 39 Kan. 1, 17 Pac. 324, the Supreme Court of Kansas held that to show that other railroads had adopted different rules, when standing alone, afforded no proof that the rules in question were insufficient.

The case of *A., T. & S. F. Ry. Co. v. Carruthers,* 56 Kan. 309, 43 Pac. 230, is to the same effect.

In the case of *Abel v. Delaware & H. C. Co.,* 128 N. Y. 662, 28 N. E. 663, cited by counsel for respondent, we think the court clearly holds that negligence may not be predicated upon the mere fact that others in the same line of business have adopted a different rule from the one in question upon the same subject. In the opinion, at page 667 of 128 N. Y., at page 665 of 28 N. E., it is said:

"The defendant's counsel excepted to that part of the charge 'in relation to the jury determining what were proper rules and they might conclude what rules should be.' If the charge is to be construed as leaving it to the jury to determine, irrespective of the evidence, what rules ought to have been adopted for the safety of the repairmen, and to find the one way or the other on the question of the defendant's negligence in conformity with the conclusion so reached, the charge was undoubtedly erroneous."

From what is there said it seems clear that the New York court holds that the jury must determine the sufficiency or insufficiency of a rule prescribing a method of doing the work from the evidence in which the character of the work is shown, and in what way the rule should regulate the work so as to make it reasonably safe, and further show why the rule in question, if followed, does not accomplish such a result. To require this is but reasonable, and to our minds is self-evident. It may be that the thing requiring regulation may be so apparent, and the defect in the rule upon the subject may be so obvious, that a mere inspection of the defective rule, when compared with a different one, may make clear to the ordinary mind the defect, and in what the defect consists. But this cannot be universally true. In a matter so complex as the operation of numerous trains upon a single track in opposite directions during all kinds of weather, both day and night, with a large force of employees working to a common purpose in different departments, it necessarily requires a large experience and a thorough knowledge of details to formulate rules for the government and control of trains so as to make the running of them as safe as possible, in view of all the circumstances. In this regard the safety of the public must be considered, as well as the safety of the employees. If, therefore, it is claimed that a rule with regard to the regulation of trains is insufficient, can an ordinary jury, by a mere inspection of a rule, say whether it is so or not? If it cannot do this from the mere inspection of the rule in question, is it in a better position to do so by comparing the rule in question with some other rule upon the same subject? Would

any one seriously contend that an ordinary jury would be competent to formulate proper rules for the government and regulation of a complex railroad system? There can be but one answer to this question, which must be in the negative, because the men composing the jury ordinarily lack the knowledge and experience which are essential to the proper discharge of such a duty. If, therefore, a jury is permitted to pass judgment upon a rule which of necessity must be based upon a knowledge of details and experience in the business sought to be regulated, without evidence which points out and makes clear to them the requirements of the business and in what manner and for what purposes regulation is required, and the facts from which the deduction may be made why one method is better than another, then a jury may condemn a rule that they would be utterly incompetent to make. Suppose a juror were called as a witness to testify upon the question whether a certain rule promulgated to regulate a certain business was sufficient or not for that purpose, would he not have to qualify as to his competency by showing his knowledge and experience upon the subject? If, therefore, he would be incompetent to pass upon the sufficiency or insufficiency of a particular rule, would he be competent to pass judgment upon another rule upon the same subject, and by comparing the one with the other say which one is insufficient? If a jury may do this, all that is necessary is to submit the rules to them and permit them to compare one with the other, and from such comparison either sustain or condemn the rule in question. In this way one jury may condemn one rule today by comparing it with another, and a second jury may the next day condemn the rule which was used for comparison by the first. Thus both rules are condemned by simply comparing one with the other. In point of fact it may be that both rules were insufficient and were justly condemned, but this is not the question. The vice is not in the fact that both rules have been condemned, but in the method by which such a result was reached, namely, by simply comparing rules or methods, and without further

evidence to inform the jury why and in what respect the rules were in fact insufficient. Without such evidence the jury acts without the information which is required to enable them to pass judgment, and which the experience of experts in the business alone can impart to them. If a jury may condemn rules by mere comparison, then just as long as rules differ both may be condemned upon the sole ground that there is such a difference. In such event the conclusion is not based upon the evidence establishing the insufficiency of a rule, but merely upon the conjecture of the jury that one rule must be defective because it differs from another on the same subject. This identical question came before the Court of Appeals of New York in 1907 (*Pearsall v. N. Y. C. & H. R. R. Co.*, 189 N. Y. 474, 82 N. E. 752), and that court held that merely to show what the rules of defendant company were, in comparison with the rules of other railroad companies upon the same subject, presented nothing for a jury to pass on, and that the cause was erroneously submitted to the jury. The case at bar affords a striking illustration of how easily a jury may be misled by merely comparing rules and from such comparison alone determining their insufficiency. The rule of appellant which prescribed the method of issuing and transmitting train orders was in force, so far as the deceased was concerned, since February 24th, 1902, when he received a copy of it and passed an examination with regard thereto. The accident occurred on November 11th, 1904.

The testimony shows that there were at least sixty-six train orders issued upon the division upon which the deceased was employed on the day of the collision; that some days more than that number were issued, and some days less, but from the testimony sixty-six may be taken as a fair daily average; that train orders would usually be repeated back by the different operators a considerable number of times, and that order No. 59 was in fact repeated back six times in the form it was originally transmitted by the dispatcher. In view of the evidence, we are certainly below the average

when we assume that all train orders were repeated back at least three times. If we thus multiply the average daily number, namely sixty-six, by the average daily repetitions, it gives us 198. This is the number of times that the method employed by the appellant was applied each day on only one of the divisions of its system. If we multiply the daily repetitions by thirty, it gives us a monthly average of 5,940, while the yearly average amounts to 71,380 times. The testimony further shows that there were nine divisions on appellant's system west of Omaha, Neb., and that the trains of the Oregon Short Line Railway passed over the rails of the appellant east of Granger, Wyo. From this it is only fair to assume that the average number of repetitions of train orders as we have given them is below rather than above the average. As we have stated, the rule became effective on February 24th, 1902, and was thus in force at least thirty-two months at the time of the accident. The number of repetitions on the Evanston division within that time, according to the average we have adopted, would amount to 190,080. So far as the evidence discloses, the method adopted by appellant of transmitting and transcribing train orders thus failed, if it failed at all, once in 190,000 times upon one of the nine divisions of its railroad system. It may be that it failed more often, but if it did it would have been an easy matter for respondent to have shown the fact. In view that train orders are sent out as often as we have shown, and that they necessarily must be received by a great number of trainmen and station operators, it would seem absolutely impossible to conceal the defect in or insufficiency of the rule prescribing the method, if such be the fact. But notwithstanding the fact that not a single instance was shown where the method used by appellant failed, if followed by the employee, the jury condemned the method, and did so upon the sole ground that a considerable number of other railroads used a different method. 10, 11 There is no evidence whatever that by following the method used by such other roads mistakes are obviated, nor is

there any that under the method used by appellant mistakes are not avoided if the rules are followed and obeyed by the employees. The jury simply assumed that such was the fact, and, under the instructions as given by the court, they were authorized to assume it. Not only were the jury permitted to enter the realm of speculation with regard to the foregoing facts, but they were also permitted to assume that appellants' rules were insufficient when followed.

The test of whether a rule is insufficient or not lies in the fact that it fails to afford adequate protection when followed, and not that it fails because it is disregarded. Quite true, a rule may be so framed that it is impracticable to follow it, but, if it is, it may be insufficient for that reason. Moreover in the instruction it is in effect assumed that a rule or method which provides that numbers in train orders shall be stated in both words and figures is a proper rule, and a standard to which all other methods shall conform. With regard to this the court told the jury that, if they found that ordinary care required that the defendant "should have adopted a rule providing that when time is stated in the body of a train order it should be expressed both in words and figures and not simply in figures, then the court charges you that the failure of the defendant company to exercise such ordinary care would constitute negligence." The duty cast upon the appellant by this instruction is not that it was required to exercise ordinary care and diligence to provide rules which under the circumstances would prove adequate when followed to protect the employees against avoidable and unnecessary dangers, and which would make the conduct of its business reasonably safe, but the appellant was in effect declared negligent unless it adopted a particular method, namely, that of stating the time in the body of its train orders in both words and figures. We know of no law by which an employer is required to adopt one method rather than another in conducting his business. The law, as we understand it, upon this point is well stated in

*Norfolk & W. R. Co. v. Cromer,* 101 Va. 671, 44 S. E. 899, in the following language:

"Courts and juries cannot dictate to railway companies a choice between methods, all of which are shown to be reasonably adequate for the purposes intended to be subserved. Thus to subject them to the varying and uncertain opinions of juries in questions of policy, and to substitute the discretion of the latter for their discretion would be wholly impractical, and would prove alike disastrous to the companies and the public."

If this is the law, it is obvious that whether appellant was negligent or not with regard to the conduct of its business cannot be determined by a mere comparison of its methods with those employed by others, although it were conceded that the method used by others was reasonably safe. It does not necessarily follow that because one method is safe a different one is not.

As we have pointed out, there is no evidence in this case which shows, or tends to show, that the rules adopted by appellant which governed the transmission and transcribing of train orders were less effective if followed than were the rules of other companies upon that subject. As we have seen, the rules of appellant required each order and each repetition thereof to a different operator to be repeated back to the dispatcher who issued and transmitted the orders. If it was repeated back correctly, it received the "O. K." of the dispatcher; otherwise not. In repeating it back, the operator thus had the correct order before him, and by another rule he was required to trace all copies from the order which was proved to be correct. If the operator thus had the time correctly stated in figures, and if he traced the additional copies from the correct order, it is not easy to see why all copies would not have been the same. No doubt, if the operator disobeyed the tracing rule and attempted to copy from memory, a mistake might occur in the copy although the original was correct. But can it be said that a rule is insufficient simply because a mistake may occur if it is not followed? Would it not be quite as easy and just as probable

that the operator would make a mistake in copying a train order in which the time was stated in both words and figures as in copying one in which the time was stated in figures only? If this is so, how can it be said, in the absence of any evidence upon the subject, that a rule which required time to be stated in both words and figures is sufficient, while one which required the time to be stated in figures only is insufficient? The question here is not that the appellant was negligent in issuing and transmitting an incorrect train order. There is no claim nor evidence that the train dispatcher did not issue and transmit the order giving the running time of No. 3 correctly, nor is there any claim or evidence that the order was so imperfectly written that it either confused or misled the trainmen. The order in question was plain and easily understood. The only defect in the order was that "50" was, by some one and in some way not disclosed by the evidence, substituted for "30," and in that way gave a difference of twenty minutes in the actual running time of No. 3. If the dispatcher had issued such an order and had thus misled the trainmen, and this order had been the proximate cause of the collision, a different question would be presented. No such a claim is made in the complaint, and there is no evidence to substantiate such a claim. Neither was the case submitted to the jury upon such a theory, but, as we have seen, it was submitted to them upon the theory that the rules of the appellant with regard to the transmission and transcribing of train orders were insufficient upon the sole ground that they did not require the time in train orders to be stated in both words and figures.

A striking illustration that a rule which requires time to be stated in both words and figures may not, under all circumstances, be the best, is afforded in the case of *McLeod v. Grinther*, 80 Ky. 399. In that case a train order was issued which gave a certain train until 10 o'clock to make a certain point. The order was written thus: "Fish extra east; can have until ten, 10 o'clock a. m., to make Beards for number 2 and number 4." This order was intended to mean 10

o'clock, while the conductor construed it to mean ten minutes after 10 o'clock. The company was held liable in that case for not exercising ordinary care in writing the message, in that the figures "10" should have been placed in brackets to show that they were intended as a repetition of the word "ten," and not as additional time. We cite this case merely to show that neither a court nor jury is justified in assuming that one rule or method is to be upheld and another should be condemned upon the sole ground that they differ with regard to the methods that are to be followed in doing a particular thing which requires careful and constant regulation. In this connection it should also be kept in mind that, where rules have been deliberately formulated and promulgated by the master for the government of a complex and dangerous business, they should be condemned only when it is clearly made to appear that they are in fact insufficient. "The presumption is that rules which the master has adopted for the government of his servants, to prevent injuries to them, are reasonable and sufficient." (26 Cyc. 1159; *Rex v. Pullman Palace Car Co.,* 2 Marvel (Del.) 337, 43 Atl. 246; *Little Rock, etc., Ry. v. Barry;* 84 Fed. 944, 28 C. C. A. 644, 43 L. R. A. 349; *Vedder v. Fellows,* 20 N. Y. 126.)

While in the last two cases cited the doctrine that the question of the sufficiency of a rule is one of law and not of fact is enforced— a doctrine which we think is against the weight of authority—yet, so far as we are aware, the courts, whether they hold to the doctrine that the sufficiency of rules is a question of fact for the jury or one of law for the court, all agree that the insufficiency of a rule should clearly be established before it is condemned. This court is committed to the doctrine that the sufficiency of a rule is a question of fact. (*Johnson v. U. P. Coal Co.,* 28 Utah 46, 76 Pac. 1089, 67 L. R. A. 506.) The controlling reason, however, which has impelled a majority of the courts to hold that the question is one of fact rather than of law is because it requires evidence from a competent

source to determine the question of sufficiency or insufficiency of a rule, which evidence the jury, it is said, is perhaps better qualified to weigh and pass on than the courts. The reasons for holding the question one of law are perhaps as well and as clearly stated by Mr. Justice Sanborn in *Little Rock, etc., Ry. Co. v. Barry, supra,* as they can be, while the reasons in favor of the rule that the question in one of fact are convincingly stated by Mr. Justice Thayer in his dissenting opinion in the same case. We are impressed with the soundness of the reasons advanced by Mr. Justice Thayer in favor of the doctrine that the question is one of fact. If it should be held, however, that the jury may, without other evidence than that of a mere comparison of rules and methods, in all cases declare one sufficient and the other insufficient, then the vices of both doctrines as they are declared to be by the courts would be adopted, while the virtues of neither would be preserved.

For the foregoing reasons, therefore, we are clearly of the opinion that there was not sufficient evidence in this case to authorize the court to submit the question of the sufficiency of appellant's rules and methods to the jury, and that the court likewise erred in its statements of the law in the instructions herein referred to.

We will now proceed to consider the questions of the alleged contributory negligence and assumed risk of the deceased. Both of these questions arise out of the assignment that the court erred in refusing to direct a verdict for appellant, a matter already referred to. In order to appreciate the full import of the propositions involved, it becomes necessary to refer to some facts in addition to those already stated.

The deceased, his fireman, the conductor, and two brakemen constituted the train crew of extra train No. 1661, which left Evanston, Wyo., at 5:20 p. m. on the evening of November 11th, 1904. Engine 1661 was in a defective condition, by reason of which it leaked steam from the valve stems, cylinder, and piston heads to such an extent as to

envelop the engine and boiler with the escaping steam, and thus obscured the headlight of the engine so that it could not be seen by those on an approaching train, and prevented those on engine 1661 from seeing in advance of it. This condition of the engine had existed for several months prior to the accident, and the condition thereof and the dangers incident thereto had been reported by the trainmen to the proper persons whose duty it was to make repairs six or seven times prior to the accident, but the engine was not repaired. On the night of the accident, in making the trip between Evanston and Granger, numerous persons saw engine 1661 and noticed the escaping steam, and their testimony is to the effect that engine 1661 was so enveloped in steam when in motion, and even when standing still, that it seemed like a bank of steam, and the numbers upon it could not be seen or the engine identified unless one went close up to it. This condition was discussed by some of the witnesses with the deceased and the fireman on the engine while they were on the trip and before arriving at Granger. The testimony, also, was to the effect that the harder the engine was required to work the more steam it leaked; that there were some considerable grades between Evanston and Granger to overcome, and that it was slightly downgrade for five miles after leaving Granger toward Azusa, and the remainder of the distance was slightly upgrade; that train order 66, which was delivered to the deceased at Granger, and under the authority of which he left that station for Azusa, although marked "complete," was not so, because it lacked a statement of the time when it was repeated, if repeated at all, and that said order gave the crew of train 1661 the right of way over the trains mentioned therein, and authorized said crew to proceed on their way to Green River, but it was not a direction for them to start at any particular time, and such start was to be made upon the judgment of the deceased and in accordance with the ten minute clearance rule hereinafter referred to; that there was no record in the dispatcher's office that train No. 1661 had left Granger, nor is there any

evidence tending to show that the dispatcher knew that 1661 was about to leave or had left that station, and there is no record of the time the train did leave Granger for Azusa. There is also evidence to the effect that the escaping steam did not materially affect the running capacity of engine 1661 except with a load when going upgrade, and that the distance between Granger and Azusa, in the judgment of the witnesses, could have been made in from ten to twelve minutes with engine 1661 on the night of the accident. It also was made to appear that when the collision occurred the deceased engineer, his fireman, the conductor, and the head brakemen were all on engine No. 1661, and that the three latter were killed outright, while the deceased died some time after the collision. There are numerous facts, which, in view of our conclusions, are not deemed material, but such as are deemed so will be stated in connection with the points discussed.

As we understand the law when applied to the undisputed facts, it prevents a recovery in this case as the record now stands. The underlying principles which govern and control the questions of contributory negligence and assumed risk have so often been stated, illustrated, and applied by both courts and text-writers that it seems a work of supererogation to even make an attempt to state them here, and we shall not do so. That these questions are ordinarily questions of fact is elemental. That there are well-recognized exceptions is equally so. We shall therefore not pause to state under what circumstances they are either questions of fact or of law. Nor do the courts greatly differ, if they differ at all, in the statement of the rules of law which control, but they frequently differ with regard to the application of these rules to a given state of facts. We shall therefore review the facts as we understand them at some length, and, in doing this, shall attempt to show that both questions, in view of the undisputed evidence, are questions of law and not of fact.

The true solution of both questions must necessarily depend upon the facts and circumstances of each case, and

cannot be determined as questions of law unless all reasonable minds, in considering all of the facts when reasoning from cause to effect, should and would arrive at the same conclusion. Applying these rules to the undisputed facts in this case, was the deceased guilty of contributory negligence as a matter of law? As a preliminary condition it must be remembered that the deceased must be regarded as an expert; he was engaged in a department of appellant's business calling for special skill and experience; he was familiar with all of appellant's rules and methods applicable to the movement of trains, and, as an expert, must be held to have known and appreciated the ordinary dangers incident to the movement of trains under the rules and methods adopted by appellant, in so far, at least, as those rules and methods were reasonably sufficient to protect him against unnecessary and avoidable dangers. To this extent the rules and methods of appellant which were, or by the exercise of ordinary care and diligence could have been, known to the deceased, became a part of his contract by which the relation of master and servant was created between them. Upon this proposition the authorities leave little, if any, room for either doubt or dispute.

Mr. Dresser, in his work on Employer's Liability, in section 69, p. 310, says:

"Rules established in the business become a part of the contract made by the servant upon entry into the employment, and risk of injury from the impropriety of them was assumed, so far as the danger could be known to the servant by the exercise of reasonable care."

Again, in section 109, p. 521, the same author says:

"The plaintiff is bound to obey the rules established by his master relating to the conduct of the business, and they become a part of the contract of service."

In 3 Elliott on Railroads (2d Ed.), sec. 1297, the author says:

"The general rule is that enginemen assume the risks incident to the employer's methods of business; and there is, indeed, no valid reason why they should be excepted from the rule."

The doctrine is also thoroughly discussed in some, if not all, of the following cases: *Slater v. Jewett*, 85 N. Y. 61, 39 Am. Rep. 627; *Hinz v. C. R. & N. R.*, 93 Wis. 16, 66 N. W. 718; *Hewitt v. F. & P. M. Ry. Co.*, 67 Mich. 77, 34 N. W. 659; *Hughes v. Winona & St. P. Ry.*, 27 Minn. 137, 6 N. W. 553; *Naylor v. C. & N. W. Ry.*, 53 Wis. 661, 11 N. W. 24; *Illinois Cent. Ry. Co. v. Neer*, 26 Ill. App. 356; *Illinois Cent. Ry. Co. v. Neer*, 31 Ill. App. 126; *Wolsey v. Railway Co.*, 33 Ohio St. 227.

He must also be held to have been fully aware of the condition of the engine operated by him at the time, and to have known what, if any, effect this condition would or might have upon its capacity; that whatever these defects were they might give rise to complications in the movement of his, and possibly in that of other trains. In other words, he, as a matter of law, was charged, as between himself and his employer, with that knowledge which an ordinary man possessing the skill and experience he possessed would know, or, by the exercise of ordinary care, ought to have known in view of all the circumstances.

In connection with these matters, he was also bound to observe and follow the rules which were adopted by the master governing the employees' actions for the purpose of insuring reasonable safety in the movement of trains, in so far a he knew them, or by the exercise of ordinary care and diligence might have known them. When the deceased, as an engineer on engine No. 1661, received the second edition of train order No. 59, which gave the running time of the passenger train as one hour and fifty minutes late instead of one hour and thirty minutes, we shall assume, for the purpose of this opinion, that the deceased was not negligent in not observing that the second No 59 order was not worded as the first was, although the rules positively stated that train orders of the same number

must be worded precisely alike, and the deceased then had in his possession, and had had for over three hours, the first No. 59 order, showing the wording to be different. We shall assume, further, that the deceased had a right to rely upon the train order giving the time of No. 3 passenger train as running one hour and fifty minutes late, and that train order No. 66 which gave the deceased the right to move his train from Granger to Green River was complete and gave him authority to start his train eastward, although there is some undisputed evidence in the record that train order No. 66 was not in that complete condition. It, however, was indorsed complete, and we shall so treat it.

Under the circumstances in this case the deceased expected to meet a passenger train, which was superior to his train, at the next station. He was therefore required to start his train in accordance with rules No. 1261 and No. 89. Rule 1261 is as follows: "Engine men must know their time on the road, and will not start from the station, even though they receive a signal from the conductor, unless they can reach the next station in time to properly clear superior trains." Rule No. 89, which must be read in connection with the foregoing, is as follows: "At meeting points between trains of different classes, the inferior train must take the siding and clear the superior train at least ten minutes, and pull into the siding when possible. If necessary to back in, the train must first be protected as per rule 99 unless otherwise provided. An inferior train must keep at least ten minutes off the time of a superior train in the same direction." The evidence without conflict shows that it was the duty of the trainmen under those rules to keep in mind the difference between the schedule time of the train and the time it was in fact running under late orders, and arrange the movements of inferior trains so as to comply with the foregoing rules at meeting points. The regular leaving time for No. 3 from Green River was 9:30 p. m. Assuming it to have been one hour and fifty minutes late, it should have

35 Utah—22

left Green River at 11:20 p. m. It actually did leave, according to the evidence of the conductor, at 11:14, and, according to the records of the train dispatcher, at 11:13 p. m. Running one hour and fifty minutes late, this train should have passed Azusa station, the meeting point, at 12:02 a. m. The deceased, before starting his train from Granger, had the right to assume that the passenger train would pass Azusa not sooner than 12:02 a. m. He would thus have to time his train so as to be on the siding and in the clear not later than 11:52 p. m. The only evidence as to the time the deceased left Granger with his train is given by the rear brakeman on that train, who says it left the east switch, which was about fifteen car lengths from the station building, at 11:41 p. m. The distance from Granger to Azusa is six miles. The deceased, therefore, had just eleven minutes after leaving the east switch at Granger to make the run to Azusa and get his train on the siding in order to comply with the safety rule of appellant. In doing this he had the right to take into consideration the condition of the roadbed, the grades, and all matters favorable to him, but he also had to consider the condition of his engine and all matters unfavorable to making the run. Under the rules the whole matter, whether to start out with the train or not, was left to his judgment. He could not shield himself behind any order in determining whether it was safe or not in starting out his train. He knew that he had to clear the approaching passenger train at least ten minutes at the next station, which was six miles distant. If he could do this he was safe; if not, of all men he knew and must have appreciated the dangers of two trains meeting on a single track. The ten-minute clearance rule is a rule of safety, and should be implicitly followed. (*Evansville, T. & H. Ry. Co. v. Tohill,* 143 Ind. 49, 41 N. E. 709, 42 N. E. 352; *Terre Haute & I. Ry. v. Becker,* 146 Ind. 202, 45 N. W. 96.) The object and purpose of such a rule is, however, palpably manifest, and the dangers to life and limb of 21, 22 both passengers and employees in case of its nonob-

servance so great that it would seem to require neither argument nor authority to show that a conscious failure to comply with it, if possible to do so, can be nothing short of negligence.

It is contended, however, that the distance between Granger and Azusa was only six miles; that it was downgrade most of the distance, and that there is evidence in the record that this distance could have been made in ten minutes with the kind of train and engine the deceased was moving. It is urged, therefore, that it was a question of fact for the jury to say whether the deceased, in starting out as he did, was exercising ordinary care or not. It is contended, as we understand counsel, that unless the act of starting out was a violation of the rule, then there is no violation of it in this case. It is further urged that if others engaged in the operation of trains under similar circumstances would have started out the train, then the act of the deceased in starting out his train cannot be held to have been negligent as a matter of law. No doubt the ordinary test of negligence is whether men of ordinary intelligence and prudence would have done or omitted the act in question under the particular circumstances. But there are conditions and circumstances under which the law does not permit an act or its omission to be excused simply because some men would have been willing to undertake it, or willing to testify, in effect, that the act or omission did not necessarily involve danger. The hazard or danger may be so apparent and withal so serious that the law will not permit an excuse of this kind. If this were not so, then, in this case, if the run between Granger and Azusa could have been made in ten minutes, and the deceased could have entered the siding in one minute or two, as the evidence shows, why could he not be excused for undertaking the run if he had had only twelve minutes instead of twenty-one or twenty-two to make it? In case only eleven or twelve minutes had intervened, would the law permit one to produce witnesses who were willing to testify in effect that it did not necessarily involve danger to

undertake the run because the capacity of the engine and the
condition of the roadbed were such that it might have been
accomplished? True, in such an instance the engineer would
have had only two minutes or less to escape the opposite train,
while in this case he had the two minutes to keep within the
ten-minute clearance rule. These ten minutes were given as
a margin of safety, no part of which was at the disposal of
the inferior train. If the train was on the main track within
the ten-minute rule, it was where it had no right to be.
Any other construction of the rule would make it useless.
The true situation, therefore, was as follows: The trainmen
of train No. 1661 were experts in the handling and move-
ment of trains. As such experts they were placed in charge
of that train, and to control and move it in accordance with
the rules and regulations which had been adopted for the
safety of themselves and the employees on other trains and
of the passengers thereon. In starting out from a station to
meet a train coming in an opposite direction, the time and
manner of starting was left entirely to the judgment of these
expert trainmen. The only condition imposed was that un-
less inferior trains could make the meeting point and be in
the clear for the space of ten minutes before the superior
train, running upon its schedule time or upon orders, would
reach the passing point, then the inferior train must not un-
dertake the run. The whole matter was, in the nature of
things, left, and had to be left, to the judgment of the train-
men. The safety of the property of appellant, as well as
that of its employees and passengers, was thus intrusted to
the care and judgment of these trainmen. Under the rule,
although the conductor thought the run could be made, and
he ordered the engineer to start (it being assumed that the
engineer was perhaps better acquainted with the physical
condition of his engine and machinery), the engineer not
only was given the right, but it was made his duty, to dis-
regard the orders of the conductor and to refuse to start his
train unless he felt satisfied that the run could be made and
the train cleared at the meeting point at least ten minutes

before the arrival of the superior train. This, in and of itself, shows that it was intended that the care to be exercised in starting an inferior train was to be commensurate with the danger involved in meeting a train going in an opposite direction on the same track. The engineer thus was required to consider everything which could in any way affect the result of placing his train in the clear under the ten-minute rule. If there was something wrong with the engine or the train, it certainly was a matter to be considered as of the highest importance. That engine 1661 was in a defective physical condition, and that the trainmen on the train drawn by it knew it, is beyond cavil. That the finding of the jury that the appellant was negligent in sending out this engine was sustained by the evidence, we have already held in the case of *Stone v. U. P. Ry. Co.,* 32 Utah 185, 89 Pac., 715. The collision in this case is the same as the one involved in that case, and the evidence with regard to the condition of the engine is the same in this case as it was in that, since the evidence taken in that case upon this point was read to the jury in this case. It was further held in that case that the jury were authorized to find that in the exercise of ordinary care the appellant "ought to have anticipated that injury would naturally and likely result therefrom (from the sending out of this engine), and that it even ought to have anticipated the probability of an accident such as happened." If it was negligence to send out this engine by appellant, why was it not, *prima facie* at least, also negligence on the part of the trainmen, in view of their knowledge and experience, to run the engine after having full knowledge of its condition? If the defects in the engine were such as to probably result in a collision, and this was a matter appellant, in the exercise of ordinary care, could have anticipated, why should not the expert trainmen who were in control of it also have anticipated the result? But the situation as it affects appellant, and as it confronted the deceased in starting with the engine from Granger, is hardly parallel. If appellant had ordered engine 1661 to start out with the train

from Granger to Azusa while believing that No. 3 was one hour and fifty minutes late, and under the conditions and circumstances in which it was started, then the situation and condition as they affect both appellant and deceased would be parallel. Would any one doubt the negligence of appellant if it had ordered engine No. 1661, in the condition it was, to make the run from Granger to Azusa when there were only twenty-one or twenty-two minutes in which to make the run, of which ten minutes had to be excluded under the safety rule? If appellant had done this, then it would have stood in precisely the situation in which the trainmen, and especially the deceased, stand with respect to the starting of engine 1661 from Granger. The train was under the direction and control of the engineer whenever the question of meeting a superior train was involved. It was left to his judgment as to whether he would meet the superior train at the station his train then was, or whether he would make the meeting point at the next station. In this regard the appellant imposed no conditions upon the engineer except so to time his train that it would be in the clear at the meeting point at least ten minutes before the superior train was to be there. The question, therefore, is, whether the deceased, in view of all the circumstances, can be said to have acted as an ordinarily careful and prudent man in starting out his train from Granger on a margin of only eleven or twelve minutes in which to make a distance of six miles and keep within the ten-minute safety rule. Can it be said that to run an engine which is defective on a margin of only one or two minutes to meet a fast passenger train at a point where it is known it will not stop is an act that admits of any debate with regard to being prudent or otherwise? If, under such circumstances, the appellant had ordered engine 1661 to make the run, and a collision would have occurred, would this act not have been one of gross, if not criminal, negligence as against the passengers, and one of culpable and inexcusable negligence as against its employees on the passenger train? Could any court be found anywhere that would

hold such an act under such circumstances, and in the face of such danger to human life, not to be negligence as a matter of law? Would, under such circumstances, appellant be permitted to introduce evidence to show that in the judgment of trainmen the run could have been made within time to be within the safety rule? There are circumstances and conditions where human life is in danger, and the danger is imminent, when the law will not permit men to say that others would also have taken the chances. Nor is it an answer to say that the appellant was under the law required to exercise greater care than the trainmen. If this be conceded, so far as it related to the safety of the passengers, it, under the circumstances, did not apply as between it and its employees. With regard to the starting out with this train, appellant had left the matter in the hands of the trainmen. It could have left it nowhere else. It was their duty to safeguard the lives of their co-employees as well as those of the passengers. Did they act as ordinarily prudent men in taking the chances they did upon so slight a margin of time, with an engine in a defective condition? In our judgment there is, there can be, no room for difference by reasonable men upon this question.

Assuming, however, that it was not negligence as matter of law to attempt to run between Granger and Azusa under the circumstances, the question still remains whether the deceased was not guilty of negligence as a matter of law in not preventing the collision, or, at least, in not guarding himself against injury while on the track between Granger and Azusa. The duty to use ordinary care to prevent injury to one's self as well as to others is continuous, and is not suspended on the part of the employee simply because he may have been exposed to danger through the master's negligence. However gross the negligence of the master, when the servant discovers the danger arising therefrom it is his duty to use ordinary care to avoid the danger and consequent injury. If the servant by the exercise of ordinary care can prevent injury and does not do so, he can-

not rely upon the precedent negligence of the master. This is elementary. This principle is directly involved in view of the following facts and circumstances: As we have shown, No. 3 passenger train, if running one hour and fifty minutes late, was due at Azusa at 12:02 a. m. No. 1661 left Granger at 11:41 p. m. The collision, as nearly as it is possible to ascertain the time, occurred at about 12 o'clock midnight. The conductor on No. 3 says that the shock threw him off the seat; that he picked up his lantern and his scattered tickets, lighted the lantern, and then looked at his watch, and the time was 12:01:35 a. m., and that his watch was twelve seconds fast. If we assume that he consumed about a minute and a half in doing the things he says he did, it would make the time of the collision about as stated above. There is other evidence in corroboration of this, namely, No. 3 passed Marston station, about four and three-quarters miles east of the point of collision, according to the conductor's statement, at 11:52, and, according to the dispatcher's record, at 11:50 p. m. At Marston the engineer shut off steam, and, in the language of the conductor, allowed the engine to drift, for the reason that the engineer was waiting for a signal from the station operator. From Marston to Azusa it is slightly upgrade, and from Azusa to the point of collision it is downgrade. If the engine was permitted to drift without taking steam at Marston, it would consume some little time in gaining headway again. It is only fair to assume, therefore, that the time of the collision as the conductor gives it must be about right. The collision thus occurred about nineteen minutes after No. 1661 had left the east switch at Granger, at which time the train was in motion. The collision occurred less than five miles east of Granger. It therefore required nineteen minutes for train 1661 to make less than five miles. If it had twelve minutes to make Azusa and get into the switch, it exceeded its right to be on the main track at least seven, possibly eight, minutes when the collision occurred and it had only two minutes left in which to make Azusa station before No. 3 was due there in case it was running one hour

and fifty minutes late. If No. 1661 required nineteen min-
utes to make less than five miles all of which was down-
grade, it is not reasonable to assume that the additional mile
and one-eighth, all of which was upgrade, could have been
made in two minutes. All this must have been absolutely
clear to the trainmen on No. 1661. They knew that, when
they were on the way from Granger more than twelve min-
utes, the excess was taken from the time required by the ten-
minute rule. They knew they were on the main track, that
it was dangerous to be there, and that they had no right to
be there. By this is not meant that they were
trespassers, but what is meant is that they were there in vio-
lation of a positive rule. Moreover, they knew that if they
had arrived at Azusa station in time under the ten-minute
rule, and the train would have to be backed into the switch
instead of pulling in, they were required to protect their train
against other trains. If they had not done so, and a collision
would have occurred while they were backing in, that is,
while they occupied the main track within the ten-minute
rule, the omission to protect their train would have been a
plain violation of the rule, and, under all the authorities,
would have constituted negligence. If it was their duty to
protect their train at the station in view of the ten-minute
clearance rule, why was it not their duty to do this anywhere
after their train was on the main track within the ten-minute
rule? They knew that No. 3 would not stop at Azusa; that
it would pass right through, and would have to pass on the
very rails they were occupying. But in the face of all this
they made not the slightest effort either to protect their train
or the passenger train that they knew was due in a very few
minutes.

But it is suggested that there is no evidence to show that
the trainmen on 1661 did not protect their train, nor that
they did not comply with the rule. We confess that we are
unable to so construe the only evidence that relates to this
subject. Meranda, the rear brakeman, and the only member
of the crew that was not killed, after testifying to the time

the train left Granger, and that the conductor went forward over the train toward the engine, said: "I remained in the cupola of the caboose until we passed around the second curve out of Granger; then I got down in the caboose to fix the fire and prepare a bucket of dope to fix a hot box. Q. "While you were doing that, what happened?" A. "The collision happened while I was there." Upon cross-examination he testified that, as near as he could approximate the speed of the train after leaving Granger and before the accident, it was running from twenty to thirty miles an hour. He also testified that immediately after the collision he left the caboose and went forward to the head end of the train, and that he found "a pile of cars smashed up and people scattered around;" that the conductor was dead, and was lying between the track and the boiler of engine 1661, which was off the track; that the fireman was held fast between the boiler and tender, and was dead, and that the brakeman was under the wreck, also dead, while the engineer was buried under "some rubbish," but was still alive. It is true that there is no direct evidence to show just what the deceased, the conductor, fireman, and head brakeman did just before or at the time of the collision. But if they had observed the rule which required them to protect their train in case it was on the main line within ten minutes of the running time of a superior train, is it reasonable to assume that they all would have been caught in the collision and killed? Further, when it is shown that the train was in motion, as the rear brakeman testified, can it be assumed that it was stopped before the collision occurred? Moreover, if the train had been stopped and protected as the rule required, it would not have been at all likely that all four would have been together on the engine and injured or killed, as they were. One or more, at least, would have seen the oncoming passenger train while in the act of protecting their train, and thus have given warning to the others. In view of this evidence, can it be said with any show of reason that in the face of such a danger ordinarily prudent and careful men would not have stopped

the train and made at least some effort to protect the passenger train coming to meet them against a collision? If they found they did not have time to signal the passenger train, they certainly had ample time, after they knew they were within the ten-minute rule, to protect themselves against the results of a collision. This was an imperative duty they owed to themselves, and one they could have discharged by the exercise of the least ordinary care. The danger was one that was present and pressing. They were experienced in the business, and must have appreciated the consequences; they knew that their headlight was being obscured, and it could not be seen by a train coming to meet them. The track was straight for a long distance ahead of them after they had passed beyond the curves just east of Granger, and was straight for at least two miles immediately east of the collision in the direction they were going, and from which No. 3 was approaching. In view of all this, how can it be contended that the deceased and those with him on train 1661 were not guilty of negligence in not preventing the collision, or, at least, in not protecting themselves against its fatal consequences? The only possible construction that can be given to the undisputed facts is that the trainmen on 1661 paid attention to neither time nor conditions, but went blindly forward with their train until it was struck by the fast moving passenger train, and by the force of it they were hurled into eternity.

It may be said that if the foregoing conclusions are sound, then the *Stone Case, supra,* should have been decided in favor of the appellant upon the ground that Murphy was a fellow servant of the trainmen on No. 1661. The decision in the *Stone Case* was, however, based upon the principle that, where the negligence of the master concurs with the negligence of a fellow servant, the master is still liable to the injured servant. In that case it was held that appellant was negligent in sending out engine 1661 in view of its defective condition, and that the defect in the engine caused or directly contributed to Murphy's injuries. The

negligence of the trainmen on No. 1661 was, therefore, not the only element in that case, but the controlling element was the concurring negligence of appellant. In this case, however, the controlling factor is the contributory negligence of the deceased and his associates in not at least avoiding the injury to themselves, if not in preventing the collision when they must have known that it was imminent. The fact of appellant's negligence, even when conceded in this case, cannot aid the respondent if the deceased or his fellow servants failed to exercise ordinary care for their own safety when in the face of danger. Can any reasonable man say that the deceased was not guilty of negligence in not protecting himself against the fast running passenger train when he knew that he was on the track which that train must pass over, and that he was there in violation of a positive rule of safety? Did not the least ordinary care require of him to make at least some effort to protect himself? He had at least seven minutes in which to act, and there was no emergency confronting him that might have confused him. It was a simple question of having exceeded his time on the road, and thus he was required to protect himself against another train on the same track. But whether he failed to act, or those with him failed to do so, is immaterial. Each one was required to use ordinary care for the safety of all. If experienced railroad men can be excused from acting in such a case and can recover for injuries inflicted under such circumstances, then it must follow that a railroad company is an insurer of the safety of its employees, regardless of their own conduct when in the face of danger. If the law permits a recovery under such circumstances, then it in effect invites carelessness in the movement of trains, and experienced trainmen are under no obligation to take precautions in the face of danger, providing they can point to some precedent act of negligence of the master's. This is not the law. Where, as in this case, the undisputed facts show that the complaining servant could have avoided injury to himself by the exercise of ordinary care, and the circumstances are such as exclude the presump-

tion of care on the part of the servant, the law does not permit a recovery against the master. To our minds the circumstances show beyond all question that the deceased failed to act when he was in duty bound to do so, and hence he cannot legally recover.

But there is still another reason why the respondent must fail. In our judgment there is no escape from the conclusion that the deceased assumed the risk of injury, in view of the conceded facts and under all the circumstances of the case. While it is true that it is the duty of the master to exercise reasonable and ordinary care to provide his servants with reasonably safe machinery and appliances, and at all times to exercise that degree of care to maintain them in repair and reasonably safe, still the servant may not, if he knows the defects of a certain machine or appliance, treat it as safe. He may assume it to be safe until he knows the contrary. If he knows of its unsafe condition, and knows and appreciates the danger inherent to such a condition, or if the defect is so obvious that by mere casual inspection he can see it, then, in the absence of any special circumstance or emergency giving rise to a question of fact, he must be held to assume the danger which may be incurred in using the defective implement or machine. This is especially the case where the servant is an expert in the business, and as such is operating the machine or appliance. In this case, therefore, it may be assumed that the master had provided the servant with a defective engine. The defect was well known to the deceased, and as an expert engineer he also knew what effect the defect would likely have upon the capacity and effectiveness of the engine, and what effect its use might have upon the other trains. Under the rules promulgated by appellant, the deceased was given absolute control of his train with respect to the time of starting it from a given station with the view of meeting a train at another station which was running in the opposite direction. The only limitation that the appellant imposed was that the inferior train should be on the siding at the meeting

point ten minutes before the superior train was due there.
The deceased had thus the sole option whether he would
make the run to some other station, or whether he would
meet the superior train at the station where he was with his
train. In order to determine whether he should go or stay,
he was obliged to exercise his best judgment in view of all the
conditions and circumstances known, or, which, by the exer-
cise of ordinary care, should have been known to him. In
arriving at the conclusion, it was his duty to keep in mind
the safety of the passengers and employees, not only of his
train, if any he had, but also of those upon the other train.
If, therefore, he knew the time he had in which to make
some other station, and likewise knew the condition of his
engine and machinery, the state of the weather, the condi-
tion of the roadbed, and the circumstances surrounding him,
he was in a position to make an intelligent choice of whether
to stay or go. All the appellant in effect said to him was:
"You must not go unless you can place your train upon the
siding at the meeting point at least ten minutes before
the train you expect to meet is due there." In start-
ing out the train, therefore, the deceased assumed all
the ordinary risks incident to the operation of railroad trains.
If anything happened which retarded the speed of the train
which was merely incident to railroading, or if the condi-
tion of his engine was such that it might retard its speed, or
delay it on the way, all these matters were incident to the
run, and had to be taken into consideration by him in start-
ing, and of all of which he assumed the risk. It may be
quite possible that in starting a train an engineer may not
be lacking in ordinary care, and he may yet assume the risks
and dangers incident to making the run to the meeting point.
If he starts his train on a margin of a few minutes only,
as in this case, he must assume the risk that is incident in
not reaching the meeting point on time. All the elements in-
volved in assumed risks are present in such a case. The
engineer may go or stay; he knows the condition of his engine
and train; he knows the danger incident to the movement of

trains and the consequences of a collision; he knows the master's rules of safety, and the importance of obeying them. If he starts out, therefore, he assumes the risk incident to the failure of not getting his train to the meeting point on time, and this is so regardless of the degree of care he exercised in starting out with his train. He might possibly avoid contributory negligence, but he cannot avoid assuming the ordinary risks incident to making the run and getting his train to the meeting point within the time required by the rule. If something happens on the way, or he should have done something to protect his train which he failed to do, he may likewise be guilty of negligence; but this does not do away with the risk he assumes. By what we have said we do not mean that he assumes the risks that are attributable to the master's negligence, and which occurred on the way, unless he knew of such acts, or by the exercise of ordinary care ought to have known them, and still proceeds regardless of them. If the act of the deceased in starting out from Granger under the circumstances was not negligence as a matter of law, and if it was for the jury to say in view of all the circumstances whether he was negligent in doing so or not, it nevertheless is not a question of fact under the evidence as to whether he assumed the risk in going or not. The risks and dangers to be incurred were incident to the movement of trains on time. The mere fact that No. 3 was one hour and thirty minutes late was proof that trains lose time. This fact is so generally known that experts in the movement of trains must be held to know it and should govern themselves accordingly. If a train loses time at all, it may do so at any time or place. It is a mere incident in railroading of which all railroad men must assume knowledge. If the deceased calculated on making the run in ten or twelve minutes between Granger and Azusa, and it required twenty-five minutes instead, he assumed the risks incident to the excess of time as well as the risks incident in making it in a shorter time. Moreover, in view of the undisputed facts, it is, to say the least, a matter of pure speculation whether

the mistake in the train order was the proximate cause of the collision. It seems to us that the want of ordinary care upon the part of the train crew on train 1661 in not protecting themselves when they knew that they were within the ten minute rule of safety was the proximate cause of the collision. When there is a positive rule of safety which a servant is required to observe and obey, and the evidence without dispute or conflict shows that the rule was not obeyed by the complaining servant, and that if it had been obeyed the accident would not have occurred, the servant cannot recover, and it is the duty of the court to so declare as a matter of law. A jury may not excuse the failure to obey rules except for good cause. (*St. Louis & S. F. R. Co. v. Dewees,* 153 Fed. 56, 82 C. C. A. 190.)

From what has been said it necessarily follows: (1) That the respondent has not established by competent evidence that the appellant was negligent in not adopting a different rule or method in transmitting train orders, or in pursuing the method it had adopted and was using; (2) that the deceased and his train crew were guilty of contributory negligence in not protecting either their train or themselves when running upon the time of the superior train; (3) that the deceased determined for himself whether he would make the run between Granger and Azusa within the time he had to do so, and hence, as the evidence now stands, he assumed all risks of danger incident to the run between Granger and Azusa; and (4) that in view of the undisputed evidence, it is a matter of mere conjecture whether the mistake in train order No. 59 was the direct and proximate cause of the collision. The court, therefore, likewise erred in refusing to direct a verdict in favor of the appellant as requested by it at the close of the evidence, for the reason that, in view of the undisputed evidence, respondent was not entitled to recover as a matter of law.

The judgment is reversed, and the cause remanded to the district court with directions to grant a new trial and to pro-

ceed with the case in accordance with the views herein express-
ed.  Appellant to recover costs on appeal.

McCARTY, J., concurs.

STRAUP, C. J. (dissenting).

1.  The deceased and his train crew, going east, arrived
at Granger with train No. 1661 at 11:25 p. m.  No. 3, the
passenger train, was running west from Green River, which
is thirty miles east of Granger.  A collision occurred between
these two trains about five miles east of Granger and about
one mile west of the station called Azusa.  The schedule
time of No. 3 to leave Green River was 9:40 p. m., and to
arrive at Azusa was 10:12.  At Granger, the telegraph oper-
ator, at 11:35 p. m., delivered to the conductor of the de-
ceased's crew a copy of the train dispatcher's order with re-
spect to the movement of their train, which read:  "En-
gine 1661 will run extra Granger to Green River."  At the
same time the operator delivered to the conductor another
train dispatcher's order, which read:  "No. 3 will run one
hour and fifty minutes late Green River to Granger."  Copies
of these orders were delivered to the deceased by the conduc-
tor.  Relying on them, the deceased and his train crew left
Granger at about 11:39 p. m., with their train to make the
run to Azusa.  If No. 3 had been running one hour and
fifty minutes late, as stated in the order, it would have reach-
ed Azusa at 12:02.  The deceased had twenty-three minutes
to make the run from Granger to Azusa, a distance of six
miles downgrade.  This would have given the crew thirteen
minutes to make the run and clear the track ten minutes of
No. 3, as provided by the defendant's rules.  But the dis-
patcher's order delivered to the deceased's train crew at Gran-
ger, stating the time that No. 3 was late, was incorrect.
From the undisputed evidence it appears that No. 3 left
Green River only one hour and forty-three minutes late, and
was running one hour and forty-four minutes late at the

35 Utah—23

time of the collision. The train dispatcher's record at Evanston, the place from which the orders were sent, showed that No. 3 was running only one hour and thirty minutes late. If the order was intended to be sent as it appears entered on the dispatcher's record, either the dispatcher sent it incorrectly, or the telegraph operator at Granger incorrectly received and transcribed it. Neither the train dispatcher nor the telegraph operator were witnesses in the case. The entry appearing on the record that No. 3 will run one hour and thirty minutes late was confessedly not correct, for all the other evidence in the case, including other records of the defendant, show that No. 3 was running one hour and forty-three minutes late. The court, at the defendant's request, charged the jury that under the laws of Wyoming, the state in which the collision occurred, the telegraph operator at Granger and the deceased were fellow servants; and that if the mistake in the order was due to the negligence of the operator in receiving and transcribing the order the plaintiff was not entitled to recover, unless the jury also found by a preponderance of the evidence that the mistake made in the order was at least partly due to the negligence of the defendant in failing to exercise ordinary care to make and publish sufficient and adequate rules for the transmission and delivery of its train orders. The plaintiff's case was predicated and tried on the theory that the defendant was negligent in failing to adopt and promulgate reasonably suitable and proper rules for the transmission of such orders. In this respect it was claimed that the defendant, in the exercise of ordinary care, ought to have adopted a rule requiring numbers in the body of such orders to be transmitted both in figures and in words. Evidence was given on the part of the plaintiff that the rules of the defendant, at the time of and prior to the accident, provided that, in transmitting train orders by the dispatcher to the telegraph operators, all numbers in the body of the order were required to be stated and transmitted in figures only, and not in words and figures; and

that the defendant transmitted its train orders in such manner. Upon this point there is no conflict in the evidence.

2. In considering the law applicable to the case, it is necessary to bear in mind the questions presented for review. The defendant made thirty-two assignments of error. The first twenty-seven relate to rulings of the court in admitting in evidence, over the defendant's objections, certain testimony of the plaintiff's witnesses. Another relates to the ruling of the court in refusing to direct a verdict in favor of the defendant, and the rest to portions of the charge. After showing, among other things, the movement of the deceased's train from the time it left Evanston until the collision, the time of its arrival and departure from Granger, the telegraph orders delivered to the deceased by the operator at that place, and other orders delivered to him prior thereto, the transmission of the orders by the dispatcher to the operator, the rules of the defendant requiring numbers in the body of the order to be stated in figures only, the entry in the train dispatcher's record that No. 3 would run one hour and thirty minutes late, the order delivered to the deceased that it would run one hour and fifty minutes late, the manner in which train orders were transmitted by the dispatcher to the telegraph operators and by them received, transcribed, and delivered, the operation of No. 3 from the time it left Green River, and the collision and the circumstances attending it, the plaintiff was then permitted to put in evidence, over defendant's objection, the testimony of a number of witnesses to the effect that at the time of and prior to the accident there was a rule in use and in operation by other railroad companies which provided that numbers in the body of train orders transmitted by the dispatcher to the telegraph operators should be stated and transmitted in words as well as in figures. Much evidence was given by witnesses, some of whom had been either dispatchers or telegraph operators, others conductors, engineers, or brakemen in the employ of other railroad companies, and by a witness who was an inspector of the Interstate Commerce Commission, that such a

rule was, and had been general and in use by many other
railroad companies, and had been adopted and used by al-
most every railroad company carrying on the business of rail-
roading west of the Missouri river. While some of the ob-
jections made included the ground that the form of the ques-
tions propounded and the manner in which the fact was
sought to be proved were improper, yet, as to all of the ques-
tions propounded, the principal, and as to most of them the
only, objection made in the court below was, and the chief
contention here made is, that the fact sought to be proved
was immaterial, and that the evidence was improperly re-
ceived on the ground that "whatever the method pursued by
other railroad companies in transacting their particular busi-
ness could not be taken as a criterion to show that the defend-
ant's method was wrong;" that "it was not demonstrated that
other roads pursued a safer method," or "that other roads
had had a broader experience;" and that it was not proper,
and "was not fair to the defendant, to permit this testimony
to be given in any wise." If this evidence was improperly
received, I am clearly of the opinion its admission was pre-
judicial. I think, however, that it was both material and
competent. The defendant, employing servants in a danger-
ous and complicated business, was bound to prescribe rules
sufficient for its orderly and safe management. It may be
assumed, for it is not disputed, that the nature of the defend-
ant's business required the adoption and promulgation of
some reasonable rule with respect to the transmission, re-
ceipt, and delivery of train orders. It was alleged that the
rule promulgated and used by it was inadequate and un-
suitable, and that the defendant was guilty of negligence in
that regard. The ultimate question to be determined was,
did the defendant use ordinary care in the discharge of such
duty ? In order to properly determine it, it was incumbent
on the plaintiff to show several things: Among them, that,
from the nature of the business in which it was engaged, the
defendant, in the exercise of ordinary care, ought to have
foreseen and anticipated the necessity of the adoption and

enforcement of a rule reasonably adequate and safe, and one which was calculated to guard against and prevent dangers against which the defendant was required to guard; that the rule adopted by the defendant was not such a rule; that the rule suggested was suitable and practical, and, if adopted and observed, would have adequately protected its employees; and that due care had not been exercised by the defendant in such particulars. The defendant was not obliged to adopt the best or safest rule. It was only required to use ordinary care in formulating such rules as were reasonably well calculated to guard against casualties which might be foreseen by it in the exercise of ordinary prudence and care. It was not required to exercise a higher degree of skill and care than a fair average of persons of ordinary care, prudence, and caution, engaged in a like business and in like circumstances. When the questions as to a reasonably safe and suitable appliance or rule, and the care exercised by the employer in adopting it, are involved, I think it competent to show the kind of appliances or rules in common use by others engaged in like business and in like circumstances. Upon such a question, this court, in *Fritz v. Western, etc., Tel. Co. et al.,* 25 Utah 263, 71 Pac. 209, said:

"As we consider it, it is simply an inquiry as to the ordinary manner in which certain work is done, and we have been cited to no case where such testimony has been held inadmissible, but, on the contrary, courts have held that testimony tending to show the customary manner of doing certain work was perfectly proper"— citing cases.

This same principle is recognized in the case of *Boyle v. U. P. R. Co.,* 25 Utah 420, 71 Pac. 988, and *Fritz v. S. L., etc., Co.,* 18 Utah 493, 56 Pac. 90.

In the case of *Spiking v. Consol. Ry. & Power Co.,* 33 Utah 313, 93 Pac. 838, it is also said:

"Had the complaint charged negligence in the use of an improper fender, or of one not in general use, then it no doubt would have been necessary to support the allegation with proper proof by showing the kind of fenders in use generally by those engaged in

a similar business which was managed and conducted with ordinary prudence and care."

In 1 Labatt, Mast. & Serv., at section 213, the rule is stated as follows:

"Common usage being one of the tests by which the question whether a master's duty has been performed is decided, the fact that other individuals or corporations engaged in the same business had or had not found it necessary to make rules to regulate the particular subject-matter is one which is proper to consider in determining whether a rule ought to have been promulgated under the circumstances, or whether the rule actually promulgated protected the servant sufficiently."

The following authority and cases also hold that such evidence was properly admitted: *Abel v. Delaware & H. Canal Co.*, 128 N. Y. 662, 28 N. E. 663; 4 Thompson's Comm. L. Neg: section 4149; *Ford v. L. S. & N. S. R. Co.*, 124 N. Y. 493, 26 N. E. 1101, 12 L. R. A. 454; *Jones v. Kas. City, etc., R. Co.*, 178 Mo. 528, 77 S. W. 890, 101 Am. St. Rep. 434; *Benson v. N. Y., N. H. & H. R. Co.*, 23 R. I. 147, 49 Atl. 689; *Berrington v. N. Y. & C. R. Co.*, 131 N. Y. 582, 30 N. E. 57; *Pittsburgh, etc., R. Co. v. McGrath*, 115 Ill. 172, 3 N. E. 439.

Such evidence is, of course, not conclusive; nor is it admitted on the theory (as seems to be claimed by the appellant this evidence was admitted) that the defendant may be charged with negligence because other railroad companies adopted and used a rule other than and different from that adopted and used by the defendant, but on the principle, as illustrated by the cases, that when the conduct of an employer in this respect is on trial, it is proper for the jury to know what rules are in common use in that kind of business to better enable them to judge and determine, in looking at the different rules that prevail, what is a reasonable and proper rule, and whether the defendant used that degree of caution which is due from one of common prudence in the same situation and in like employment. It does not suffice to say, as does the appellant, that the rule adopted and used by it was "per-

fect and adequate." The adequacy and sufficiency of the rule, and the care which the defendant used in that respect, were the questions in issue, and which were to be determined upon the facts. If the jury had found that the rule adopted by the appellant was reasonably safe and proper, and was calculated to accomplish the purpose for which it was adopted, then the defendant could not have been properly charged with negligence in that respect, notwithstanding other railroad companies had adopted different rules or pursued other methods. But, inasmuch as such question was the very thing in issue, I think the evidence was properly received to aid the jury in determining it. Such evidence may not, within itself and when considered alone, be sufficient to show negligence with respect to the adoption of or the failure to adopt a particular rule; but the admissibility of evidence cannot be made to depend upon the question of its sufficiency to establish even a material fact, much less an ultimate fact in issue.

3. Complaint is also made because the plaintiff was permitted to show that prior to and up to 1902 the defendant had adopted and used a rule requiring numbers in the body of train orders to be transmitted both in words and figures, but that in 1902 it abrogated the rule and adopted the one requiring the use of figures only. I think this evidence was also admissible. In speaking of such question, Mr. Thompson, in his Commentaries on the Law of Negligence, vol. 6, section 7772, says:

"On the question of the necessity for a particular rule, evidence is admissible that such a rule had previously existed and been abolished, as showing that the propriety of such a rule had been recognized, and that the attention of the employer had been called to its necessity."

Upon the same point, see, also: *Chicago & A. Ry. Co. v. Eaton,* 194 Ill. 441, 62 N. E. 784, 88 Am. St. Rep. 161; *Mo., K. & T. Ry. Co. v. Miller,* 25 Tex. Civ. App. 460, 61 S. W. 978.

4. The next assignment of error relates to the refusal

of the court to direct a verdict in favor of the defendant. The appellant did not contend in the court below, nor has it here contended, that it was entitled to a directed verdict on the ground of insufficiency of evidence to show negligence on its part. At the close of all the evidence the defendant requested the court to give the jury the following instruction: "The court charges you, gentlemen of the jury, that in this case, as a matter of law, the plaintiff is not entitled to recover, and you will therefore return a verdict in favor of the defendant." In their brief, counsel for appellant say: "We contend that this instruction should have been given, because the uncontradicted evidence shows that respondent is precluded from recovering for the death of his intestate, for the following reasons: (1) Because of his own contributory negligence in failing to observe, and in deliberately violating, the rules and regulations provided by his employer for his guidance in performing his work. (2) Because of the negligence of the other members of the crew in the same particulars, for whose negligence, under the statute of Wyoming, pleaded and proved in this case, the defendant is not liable. (3) Because his accident and death were the results of risks and dangers known to and assumed by him at the time."

These are the only grounds stated and urged by appellant why the court erred in refusing to direct the verdict. Appellant's motion (for that is what the request was) for a directed verdict having been refused, the appellant is entitled to have the ruling reviewed, and the respondent is called upon to defend it on the grounds only upon which it is assailed. These are contributory negligence of the deceased; negligence of other members of the crew, and assumption of risk. But since the majority members of the court have held that the evidence was insufficient to show negligence on the part of the defendant with respect to the adoption and promulgation of its rule relating to the transmission of train orders, and for that reason, among others, have held that the court erred in refusing to direct the verdict, it may be observed that such

holding is largely based on the assumption that there was no evidence on such question, except that offered by the plaintiff that nearly all the principal railroads west of the Missouri river had adopted and used one system, while the defendant alone had adopted and used another and different method or system; and upon the conclusion that the evidence admitted, under the circumstances and for the reasons stated in the opinion, was not made relevant, and was, within and of itself, not sufficient to show insufficiency or inadequacy of the defendant's rule, or any negligence on its part in that respect. I do not contend that the jury was authorized to find the defendant negligent with respect to the promulgation of its rule, or its failure to adopt the rule suggested by plaintiff, on the ground merely that it was shown that other railroad companies had adopted and had promulgated a rule other than and different from that adopted by the defendant. As already observed, evidence of such fact was not conclusive on the question of defendant's negligence in that respect, and a binding instruction to that effect would clearly have been erroneous. The showing of such fact was merely evidentiary, to be considered by the jury in connection with all other evidence and circumstances shown in the case in determining whether the rule adopted by the defendant was reasonably adequate and suitable, and whether ordinary care had been taken by the defendant in adopting a reasonably suitable and proper rule. Some authorities hold that such evidence is necessary to carry the case to the jury. Says Mr. Thompson, at section 4149, vol. 4, of his Commentaries on the Law of Negligence:

"In the case of a railroad company, it has been held that, in order to take to a jury the question whether it has been guilty of the want of reasonable care in promulgating an appropriate rule which might have avoided an injury, there ought to be proof that such a rule was in operation on other roads, or that it was necessary or practicable under the circumstances, unless its necessity and propriety are so obvious as to be a question of common experience and knowledge, especially where it affirmatively appears that its existing rules reasonably provided against accidents."

To the same effect in *Fritz v. Salt Lake, etc., Co., supra,* where the defendant's motion of nonsuit was sustained, principally upon the ground that such fact was not shown. Here the plaintiff not only laid before the jury the fact that other railroad companies had adopted rules other than and different from that adopted by the defendant, but also the general nature in which the defendant's business, so far as relevant to the issue, was conducted, the manner in which it dispatched, transmitted, and delivered its train orders, the character, movement, and operation of its train, the transmission and delivery of the particular orders in question and the circumstances attending them, appellant's prior adoption and abrogation of a rule or method different from that adopted and employed by it at the time of the accident, and other facts and circumstances relating to the conduct of the particular business drawn in question and the manner in which it was conducted. Now, in a few jurisdictions it has been held that the question of the suitability and adequacy of a rule such as is here involved is one of law for the court; but I think the great weight of authority is to the effect that the questions whether the rule adopted in a given case was adequate and suitable, under the facts and circumstances in evidence, and whether the defendant exercised ordinary care in such regard, are, primarily, questions of fact for the jury. In speaking of such a question, this court, in the case of *Johnson v. U. P. Coal Co.,* 28 Utah 46, 76 Pac. 1089, 67 L. R. A. 506, approvingly quoted the rule as stated in Barrows on Negligence, p. 102, section 40, and said that the doctrine "is generally sustained by both courts and text-writers, to-wit: 'It is the duty of the master to prescribe and publish such suitable rules as the circumstances may reasonably require for the proper and safe transaction of the business. This duty of the master to protect his servants by making suitable rules for the safe management of the business, becomes more imperative in proportion to the danger and complication of the work; but whether any rule at all is required, in the exercise of ordinary care, in a particular case, or whether the one in effect

at the time of the injury was reasonably sufficient, are generally questions of fact for the jury.' "

It being conceded that the nature of the business was such as to require the defendant, in the exercise of ordinary care, to adopt and promulgate some suitable rule with respect to the transmission and delivery of train orders, the pertinent question in issue was whether the rule adopted by it was suitable and adequate, and whether due care had been exercised by the defendant in that regard. When such is the matter of inquiry the question "whether the rules and regulations devised and promulgated for the purpose of affording protection to employees are reasonably sufficient to that end presents a question for the jury." (4 Thomp. Comm. L. of Neg. section 4155.) To the same effect are the following cases' and authority: *Railway v. Echols,* 87 Tex. 339, 27 S. W. 60, 28 S. W. 517; *Southern Pac. Co. v. Wellington* [Tex. Civ. App.] 36 S. W. 1114; *C., B. & S. R. Co. v. McLallen,* 84 Ill. 109; *Eastwood v. Retsof Min. Co.,* 86 Hun, 91, 34 N. Y. Supp. 196; *Ford v. L. S. & N. S. R. Co., supra; Moore Lime Co. v. Richardson's Adm'r.,* 95 Va. 326, 28 S. E. 334, 64 Am. St. Rep. 785; 4 Thomp. Comm. L. of Neg., section 4146.

While the majority members of the court say that this court is committed to the doctrine that the question is one of fact, nevertheless, I think they have, in effect, themselves determined, on the evidence adduced, the question of adequacy and suitability of the rule, and held it sufficient and proper. I am of the opinion that these were questions for the jury.

That incorrect information was given the deceased and his train crew with respect to the movement of the passenger train is not disputed. That the mistake occurred either in transmitting the message by the train dispatcher, or by the operator at Granger in receiving and transcribing it, is equally clear. Let it be assumed that the message was correctly sent by the dispatcher, and that it was incorrectly transcribed by the operator, the question still is, is it as likely that the mistake would have occurred had the numbers in

the body of the order been transmitted in words as well as in figures ? Because of the great danger arising and the probable serious injury resulting from a mistake conveying information to the train operatives concerning the movement of trains, and because of the principle of law that care on the part of the defendant commensurate with the danger involved was required of it, I am not prepared to say that reasonable minds might not differ on the question that due care required the adoption and use of the rule suggested by plaintiff, especially when aided, as the jury were, by evidence that such a rule was in operation and in general use by other roads. The law fixes no definite standard by which the sufficiency or suitability of such a rule can be determined by us. Should we undertake to do so, the determination of necessity would have to be made from a consideration of the facts and what common prudence required. The only standard fixed by law is the one that the master is in duty bound to use ordinary care to promulgate and enforce reasonably suitable and proper rules when the nature of the business carried on by him and the circumstances of the case require the adoption of rules for the orderly and safe management of the business. Whether a given rule is suitable and practicable, and whether it is calculated to accomplish the purpose for which it is promulgated, is largely dependent upon the nature of the business, and whether it is dangerous or complicated and carried on by a great number of servants having various and different duties to perform, and the usual manner in which the business is generally conducted by those engaged in the same business. The determination of the question must, of necessity, largely involve a question of fact. The only instance in which we are authorized to say that the making of a rule is or is not required, or that a given rule is or is not suitable, or that the employer was or was not negligent in adopting or failing to adopt it, is as has been so often said by this and other courts in cases involving negligence, when there is no room for difference of opinion among reasonable men, not only as to the existence

of the facts, but also as to the inferences which might fairly be drawn from conceded facts and from which it is proposed to infer negligence. I do not think this such a case.

In this connection it is argued that the rule sufficiently guarded against the making of mistakes by providing that the receiving operator was required to repeat the message to the dispatcher, and in receiving messages to write them in manifold during transmission, and, if the requisite number of copies could not be made at one writing, others should be traced from one of the copies first made. It is urged by the appellant that this provision of the rule was not observed by the receiving operator, in that the copy of the order delivered by him to the deceased and his train crew was not written during transmission, and that in making it he failed to trace it from one of the copies first made in transmission. The claim rests alone upon inferences, and not on any direct evidence. Whether the operator wrote it during transmission, or traced it from a copy first made, or otherwise made the copy, is not shown. I do not think the evidence is so conclusive upon such matters as to require a finding but one way. The only witness who gave any testimony on the subject was the defendant's assistant superintendent, who testified that he was unable to say whether the order was copied or traced, and that "there is nothing to indicate that the order was traced or written offhand." That the order was not written in transmission, or was not traced from a copy first made, is a mere matter of inference deduced alone from the dispatcher's record, which showed that the order was sent that No. 3 would run one hour and thirty minutes late, and that the order was so repeated to the dispatcher by the receiving operator at Granger and by other operators along the line. This, of course, may be evidence of considerable weight that the order was sent as stated by the record, that it was so received and repeated by the receiving operator at Granger, and that the mistake in the order delivered by him to the deceased and his train crew was occasioned in manner as claimed. But the dispatcher's

record, the very thing from which the inference is deduced, is not conclusive of the question, nor of the facts therein recited, and is not binding and conclusive on the court and jury, especially when, upon the undisputed facts in the case, No. 3 was not one hour and thirty minutes late, as stated by that record, but was one hour and forty-three minutes late. It was the duty of the defendant to deliver to its train crews correct information concerning the movement and operation of its trains. It is conceded that incorrect information was given the deceased and his train crew concerning the movement of the passenger train. The defendant attempted to relieve itself from responsibility upon the claim made not only that its rules were suitable and sufficient, and had they been observed the mistake would not have occurred, but also that the mistake which was made was solely due to the receiving operator, who, the court charged, as requested by the defendant, was a fellow servant of the deceased. The plaintiff had the burden of proof on the first, and the defendant on the second, question. Whether the mistake was due to the one or the other or both were questions of fact for the jury, and not of law for the court.

5. But the first ground urged by the appellant why the verdict ought to have been directed was that the evidence conclusively shows contributory negligence on the part of the deceased. The claimed acts of contributory negligence are specifically pleaded in the answer. The only acts there alleged, and the only acts urged by the appellant in the court below, and which are here urged by it, are that, under the circumstances of the case, the deceased and his train crew left Granger at a time when they ought to have known that they could not make the run to Azusa in time to clear No. 3 in accordance with the defendant's rules, and that they were negligent in not observing that the train order delivered to them at Granger by the receiving operator stating that No. 3 would run one hour and fifty minutes late was incorrect, and that they were negligent in relying and acting on the order. The evidence shows that the engine operated by

the deceased on the night in question so badly leaked steam and in such quantities that it enveloped the engine and boiler with steam, and so obscured the headlight that it could not be seen by those on an approaching engine, and prevented those on the freight engine from seeing in advance of it. This condition of the engine had been regularly reported six or seven different times prior to the accident by employees of the defendant who had operated the engine. A special report was also made of it on the 9th day of November to the roundhouse foreman at Evanston, who was told that the engine leaked steam so badly that it was difficult to see the track ahead of it, and that unless it was kept in and repaired some one would get hurt or killed. The engine was not repaired. It was sent out by the defendant on the evening of the 11th of November in such defective condition. The court charged the jury that the plaintiff could not recover on the alleged acts of the defendant's negligence in furnishing the deceased a defective engine on the ground that the deceased, in operating the engine on the night in question, knew of such defects and assumed the risk. The court took such question from the jury, and further charged them that if they found that the defective condition of the engine "caused, or in any wise contributed as a proximate cause, to the accident which resulted in the death of plaintiff's intestate, then the plaintiff cannot recover in this action." The defendant's assistant superintendent testified that there was a bulletin order which restricted the speed of 1,600 compound engines, to which class the engine operated by the deceased belonged, to thirty miles an hour, but further testified that such bulletin order was issued by the master mechanic for the benefit of the mechanical department, and "to keep the engines, on account of being such heavy machines, from being pounded to pieces." A copy of the order was not produced. Other witnesses testified that a schedule of thirty miles per hour was allowed, but it did not mean that a uniform rate of thirty miles per hour had to be maintained, and that such engines and trains, at some places, could

run faster or slower, depending upon the circumstances, as to whether it was down or up grade; and that such had been the custom and practice of operating engines of the class to which the deceased's engine belonged.

The deceased and his train crew arrived at Granger at 11:25 p. m. All prior orders delivered to them then ended and became ineffectual. They were not authorized to leave Granger without orders from the dispatcher. At 11:35 p. m. they received an order from him authorizing them to leave Granger and to proceed to Green River. At the same time they received the order informing them that No. 3 would run one hour and fifty minutes late. They left Granger for Azusa, a distance of six miles, at about 11:39. The only witness who testified as to the time of their leaving was the rear brakeman. He testified that after the train had pulled out and left the depot and passed the switch, which was adjusted by him, and after he got on the train and took his position in the caboose, he looked at his watch and it then was 11:41, and that perhaps a couple of minutes had elapsed from the time the train left before he looked at his watch. The record of the defendant's train dispatcher does not show the fact or time of the departure of the freight train from Granger. Whether it was the fault of the operator in not reporting it, or whether the dispatcher failed to record it, is not shown. Had No. 3 been late one hour and fifty minutes, it would have reached Azusa at 12:02. That would have given the crew twenty-three minutes to make the run to Azusa; that is, they had thirteen minutes to make the run and take the switch or siding at Azusa ten minutes in the clear of No. 3, in accordance with the defendant's rules. Running at the rate of thirty miles an hour, it would have taken them twelve minutes to make the run. The track from Granger to Azusa was downgrade for the first five miles, and from there on a slight up grade the rest of the distance. The country between the two places was open, the track straight, and the view unobstructed. The two trains collided a mile and about one hundred and fifty yards west of Azusa. The

conductor of No. 3 testified that at the time of the collision he was seated in a chair, and that the first shock threw his chair backwards, and the next threw his feet over his head and against the partition; that after he collected himself, replaced the chair, and adjusted a cushion on one of the seats, picked up and lit his lantern, he looked at his watch, and it then was 12:01 and a few seconds. He, however, further testified that his train was running at a rate of fifty miles per hour. The defendant's record shows that No. 3 passed Marston, a place four and one-half miles east of the place of the collision, at 11:50. There was no telegraph station at Azusa, and no stop was made there. If No. 3 was running fifty miles an hour from the time it left Marston until it reached the place of the collision, it reached the latter place 5.4 minutes thereafter, or at a little past 11:55. If it was running only at the regular schedule time, thirty-five miles an hour, it passed Azusa at 11:56 and reached the place of accident between 11:57 and 11:58. If No. 3 passed Marston at 11:50, about which there is no dispute, and running at a rate of fifty miles an hour, down-grade as shown by the evidence, or even at thirty-five miles an hour, without stopping, it certainly did not take it until 12:01 to reach the place of accident, a distance of only four and one-half miles. We therefore have two things uncertain within several minutes—the exact time that the deceased left Granger with his train, and the exact time of the collision. Taking the time as approximated by the rear brakeman that the deceased and his crew left Granger, and considering No. 3 one hour and fifty minutes late, they had thirteen minutes to make the run from Granger to Azusa and take the siding ten minutes in the clear of No. 3. A number of witnesses testified for plaintiff —some of whom were familiar with the engine and had operated it several days before the accident—that the engine's leaking steam did not interfere with its running capacity in going downgrade, and that, with the kind of train to which it was attached the engine, under all the circumstances shown

35 Utah—24

in the case, was capable of being run to Azusa in ten or eleven minutes and in the clear of the passenger train. It was also shown that a car would run down such a grade twenty miles an hour without any power. Furthermore, there is evidence tending to show that on the very night in question, in going downgrade west of Granger from Spring Valley to Leroy, a distance of seven and one-half miles, such distance was covered by the engine and train in fourteen minutes; from Leroy to Carter a distance of fifteen miles, with several stations intervening, in thirty-one minutes. If the engine, west of Granger, downgrade, was capable of being operated that night by the deceased at the rate of thirty miles an hour, he may have believed that he could operate it at the same speed downgrade running east of Granger to Azusa. But it is said that they were on the way from Granger to Azusa something like fifteen or twenty minutes, depending upon the exact time of their leaving and of the collision, in going five miles, and that such time was consumed by them because of the defective condition of the engine; and that the deceased ought to have known that, though No. 3 was one hour and fifty minutes late, he could not make the run in twenty-three minutes, allowing ten minutes in the clear of No. 3. If foresight were as good as hindsight, no doubt persons frequently would act differently from the way they do. In judging the deceased's conduct, we must look at the existing facts as they were known to him, and the circumstances by which he was surrounded at the time. What caused him and his crew to be on the road as long as they were in traveling the distance of about five miles is not shown. The rear brakeman, though a witness in the case, was not interrogated upon this question by either party. The only testimony given by him bearing on the matter was that about two miles east of Granger the deceased's train ran from twenty to thirty miles an hour. Otherwise the record is silent with respect to such a question. But the inference is drawn that the deceased and his crew were that long on the road because of the defective condition of the engine. The inference

drawn is one of fact, not of law. That may be a proper infer-
ence to draw as a matter of fact, and if I sat in the jury
box I might agree with it. Being an inference of fact, the
defendant had its day in court on that question before the
jury. The deceased, of course, knew that the engine was de-
fective; that he also knew or ought to have known that, under
the circumstances, the run could not be made without violat-
ing the rules of the defendant, or that it could not be safely
made, is not so clear. Whether, under all the circumstances of
the case, the engine, because of its defective condition, was
incapable of being safely operated at a rate of thirty miles an
hour, and, if so, whether the deceased ought to have known
such fact, and whether, under all the circumstances, he was
guilty of negligence in attempting to make the run, were
questions not of law, but were peculiarly within the province
of the jury, and were submitted to them on proper instruc-
tions.

The only other ground of contributory negligence urged
by the appellant is that the deceased and the conductor of his
crew ought to have known that the order delivered to them
at Granger stating that No. 3 was one hour and fifty minutes
late was incorrect. It was shown that they at 8 :05, and at
Altamount fifty-seven miles west of Granger, received an or-
der which was also numbered 59, stating that No. 3 would
run one hour and thirty minutes late. It is contended that
the order delivered to them at Granger at 11 :35 p. m. was the
same order as was delivered to them at Altamount. The
order received by them that No. 3 would run one hour and
fifty minutes late was on its face complete and regular. True,
it bore the same number as the order delivered to them at
Altamount. From such fact it is claimed the train crew
should not only have discovered that the orders were the same,
but also that the first was correct and the last incorrect.
Though the two orders were numbered the same, they may
not have noticed such fact. Whether they were negligent
in not noticing it, is not for us to say. Had they noticed it,
still it is not clear they ought to have known that the infor-

mation stated in the first was correct and in the second was incorrect. The first order was "made complete" and delivered at 8 :05 p. m., the second at 11 :35 p. m. The natural thing to be expected of them was to act, as was done by them, on the last order delivered to them, especially since the train orders delivered to them west of Granger no longer controlled the movement of their train. Let it be supposed that in the first order delivered to them it had been stated that No. 3 was one hour and fifty minutes late, and that the information was incorrect, that in the second order it had been correctly stated that No. 3 was one hour and thirty minutes late, and that the train crew had done what is said by appellant they should have done, disregarded the last order and acted on the first, and in so doing had left Granger and run into No. 3 (for had No. 3 been one hour and thirty minutes late it would have left Azusa about the time that No. 1661 left Granger), I think there would be more room to urge negligence on their part for the reason that all prior orders delivered to them had ended, that the movement of their train was governed by new orders delivered to them at Granger, and that common prudence required that they should act on the latest information given them. They undoubtedly were required to examine the order with a view of ascertaining whether it concerned the movement of their train, and whether it appeared to be regular and complete on its face. They were not, however, required to make efforts to ascertain whether the information conveyed by the order was correct. A failure to make such effort did not subject them to the charge of contributory negligence as matter of law. It was the primary duty of the defendant to transmit and deliver to them correct information concerning the movements of its trains, and it did not devolve upon the train operatives to make investigations to ascertain whether the information conveyed was correct, for they had the right to rely upon the assumption that such duty had been performed by the defendant with all reasonable care.

The further ground upon which the majority members of

the court hold the deceased guilty of contributory negligence, his omission or failure to protect the train, was not urged in the court below, and is not urged here. No such facts were alleged, nor was there any evidence introduced with respect to such a question. What the deceased, or any member of his crew, did, or. did not do, in that regard, from the time they left Granger until the collision, is not disclosed by the evidence. In this jurisdiction the burden of proving contributory negligence is on the defendant. If it was intended to. predicate contributory negligence of the deceased on the ground of his failure to protect his train, it was necessary to show that it was his duty, as the engineer of the train, to do such things, or that he had direction of or control over such matters, and that the duty was not discharged by him. For, if it was the duty of the brakeman and not the engineer to do such things, and if the conductor had the control over and direction of such matters, and a failure to do them was negligence, then such negligence was that of a fellow servant, and not contributory negligence of the deceased. But upon these matters the record is silent. I do not see anything in the evidence to authorize a finding of fact that the deceased, or any member of his crew, did or did not, protect the train, and therefore do not see anything to warrant a conclusion imputing negligence to them in such particular, except the mere happening of the accident. I do not see wherein the observation made, that since we held in the case of *Stone v. U. P. Ry. Co.,* 32 Utah 185, 89 Pac. 715, the evidence sufficient to send the case to the jury and to authorize their finding that the defendant was negligent in sending out the engine in its defective condition, it should now be held, as matter of law, that the deceased was *prima facie* or conclusively guilty of negligence in attempting to operate the engine from Granger to Azusa, is pertinent to the question in hand.

6. The only ground urged by the appellant in support of its contention that the deceased assumed the risk is that, since the deceased, as an engineer, had been in the service of

the defendant for a number of years, he knew that the defendant, at the time of and prior to the accident, had employed a system in transmitting orders by stating numbers in figures only, and whatever "conditions of weakness" existed therein, or whatever danger or risk was involved in the use of such a system, was well known to and was assumed by him, it not having been made to appear that he ever made complaint, or that he was promised that another or different system would be adopted by the defendant. The deceased undoubtedly knew the system and method adopted and used by the defendant during the time of his employment. If he further knew that such a method was inadequate and unsuitable, or that it was not the method in general use by those engaged in a similar business and under similar circumstances, and knew and appreciated the danger arising from the use of the method used by the defendant, or knew that such dangers could have been guarded against by the use of methods in general use or by other methods which were reasonably suitable and adequate, then it might well be said that by his continuing in the service he assumed the risk. What knowledge the deceased had in that regard was a question of fact. His knowledge of such facts does not rest upon any direct evidence. The burden was on the defendant to show it. It urges that it is so conclusively shown as to take the case from the jury because of the deceased's knowledge of the defendant's method of business. Such a contention is well answered by the court in *Railway v. Archibald,* 170 U. S. 671, 18 Sup. Ct. 777, 42 L. Ed. 1188, and in *Railroad v. McDade,* 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96. The principles announced in these cases have been approved and applied by this court in the cases of *Merrill v. Railroad,* 29 Utah 264, 81 Pac. 85, 110 Am. St. Rep. 695, and *Leach v. Railroad,* 29 Utah 285, 81 Pac. 90, 110 Am. St. Rep. 708.

The principle so often applied by courts that a master and servant do not stand on equal footing, and that the servant has the right to rely upon the superior skill and judgment of the master, I think, well applies here. In order to

say that knowledge should be imputed to the deceased that the method employed by the defendant was unsuitable and improper, we are required to hold that he must be equally presumed to have known what the defendant was presumed to know. Before we are authorized to say that such knowledge of such facts should be imputed to the deceased as matter of law, we are obliged to say that such facts must have been of such common knowledge, and that the dangers arising from the use of such a system were so open and so obvious, as that all train operatives must be presumed to have known them. (1 Labatt, Mast. & Serv., section 390 et seq.) This I am unable to do. I think the question was properly submitted to the jury.

Neither can I assent to the doctrine that when train operatives leave a station with their train they, as matter of law, assume the risk of failing to get to the objective point in time to avoid collisions with approaching trains. It cannot be said that collisions are ordinary risks incident to the business. An operative may, of course, be negligent in leaving a station with his train, or in operating it along the line, which may be a direct or contributory cause of a collision. If so, he cannot recover for an injury sustained, because of his contributory negligence. True, in a sense, it may be said that one assumes the risk of his own negligence; but that is not what is meant by the doctrine of assumption of risk. The deceased assumed the risk of dangers incident to the operation of the defective engine. But on that ground the court took from the jury the issue of the defendant's negligence in furnishing the deceased and sending him out with the defective engine, and further told the jury that, if the defective condition of the engine in any wise contributed to the cause of the accident, the plaintiff could not recover. The question then arises, does the evidence so conclusively show that the defective condition of the engine and the manner in which it was operated by the deceased was the proximate or a contributing cause of the collision as to preclude a contrary finding by the jury? This, in the prevailing opinion,

has been answered in the affirmative. It is, in effect, said that the evidence is insufficient to show, and that it is mere speculation, that the mistake in the order giving the deceased's crew incorrect information concerning the movement of the passenger train was the proximate cause of the collision. The question of the proximate cause of an injury is primarily one of fact for the jury under proper instructions. (2 Labatt, Mast. & Serv., section 805; *Stone v. U. P. R. Co.*, 32 Utah 185, 89 Pac. 175, and cases there cited; *Hayes v. Mich. Cent. R. Co.*, 111 U. S. 228, 4 Sup. Ct. 369, 28 L. Ed. 410; *Ohio, etc., R. Co. v. Trowbridge*, 126 Ind. 391, 26 N. E. 64.)

It seems to me no argument is necessary to show that the jury was authorized to find, as evidently was found by them, that the mistaken information contained in the "bulled" order was the efficient cause which induced the deceased and his train crew to undertake the run, and that had they been informed that No. 3 was but one hour and thirty minutes late, or one hour and forty-three minutes late, they would not have undertaken to make the run, and the collision would not have happened. The debatable questions are, whether the evidence is sufficient to show that the mistake in the order was wholly or partly due to the negligence of the defendant in manner as in the complaint alleged, or was solely due to the negligence of the receiving operator, which have already been considered. If the breach of the defendant's duty in such regard was sufficiently established, then the questions whether such breach was the proximate cause of the collision, and whether the deceased was guilty of negligence in the particulars claimed which contributed thereto, were proper considerations for the jury.

7. The assignments of error relating to the charge are directed to portions of paragraphs 6, 9, 10, and 12. The only discussion or observation the appellant made of these assignments is the statement in their brief that what was said by them in respect of the assignments of error relating to the admission of the evidence complained of, and the ruling of

the court refusing to direct a verdict on the ground of contributory negligence, assumption of risk, and fellow service, applied to these assignments, except as to paragraph 10 of the charge, with respect to which, it is argued, the court erred in submitting to the jury the question whether Miller, the receiving operator at Granger, was in the employ of the defendant. When the portions of these paragraphs, the giving of which are assigned as error, are read, it will be seen that neither involved any matter discussed by counsel in the discussion of their prior assignments. However, I can see no objection to paragraph 6, which is fully set forth in the opinion of the majority members of the court. I do not think it open to the criticism that the "appellant was in effect declared negligent unless it adopted a particular method, namely, that of stating the time in the body of its train orders in both words and figures." To the contrary, the court charged that if the jury found by a preponderance of the evidence in the case that ordinary care required the defendant to adopt such a rule, then a failure to exercise such care would be negligence; and that if the jury found from all the evidence that ordinary care did not require the adoption of such a rule, then the plaintiff was not entitled to recover. This is emphasized in paragraph 12, where the court also charged: "Therefore the court charges you in this case that if you find by a preponderance of the evidence that ordinary care required the defendant to adopt a rule providing that when time is stated in the body of a train order it should be expressed both in words and figures and not simply in figures, and that the defendant in this case failed to exercise such care, and that such failure on its part was a proximate cause of the injury and death of plaintiff's intestate, then the court charges you that the plaintiff is entitled to recover in this action, unless" the deceased assumed the risk, etc.

I think the judgment of the court below ought to be affirmed.